**VINEYARD et al.**

v.

**TEXAS EMPLOYERS' INS. ASS'N.**

No. 14683.

Court of Civil Appeals of Texas. Dallas.

Oct. 16, 1953.

Second Rehearing Denied Jan. 15, 1954.

Caldwell, Baker & Jordan and Robert M. Hill, Dallas, and Dean Martin, Sherman, for appellants.

Burford, Ryburn, Hincks & Ford and Howard Jensen, Dallas, for appellee.

CRAMER, Justice.

This is a suit to set aside a compromise settlement agreement approved by the Board August 31, 1949, for alleged fraud in its procurement. Plaintiff Vineyard was injured in the course of his employment while working as a laborer for Fant Milling Company of Sherman, Texas.

On the trial of this cause to set aside the settlement agreement, the trial court at the conclusion of the evidence instructed a verdict for insurer and against Vineyard, and Vineyard has duly perfected this appeal from the judgment entered upon the instructed verdict.

Appellant briefs two points in substance, (1) the trial court should not have considered paragraphs 1 and 2 of the insurer's motion for instructed verdict because (1) they were each too general and did not allege specific grounds for an instructed verdict, and (2) the instructed verdict was not justified by the evidence. These points are countered by insurer that the "trial court correctly instructed a verdict for the defendant at the close of the evidence." The points and counter points will be considered together.

The two paragraphs in the motion for instructed verdict filed by insurer were in substance that plaintiff has failed (1) to plead, or (2) to prove actionable fraud sufficient to set aside the compromise settlement in question.

Appellants' contention as to lack of pleading must be overruled on the authority of Harvey v. Elder, Tex.Civ.App., 191 S.W.2d 686, error ref., and Baylor v. Eastern Seed Co., Tex.Civ.App., 191 S.W.2d 689. As said there, the only question is whether the evidence, as a matter of law, sustained the court's action.

On that question the evidence here before us is undisputed that Vineyard was required to undergo a pre-employment physical examination by Dr. Brown who was associated with a clinic regularly used by Fant Milling Company, the employer

here, for all its medical and surgical work. After Vineyard's injury he was again examined by Dr. Brown who was still connected with the same clinic.

Vineyard testified that after Dr. Brown examined him, the doctor told him he " * * * had a minor injury, lumbago, or a slight sprain, and that it would clear up within two or three weeks." That he believed Dr. Brown and that his back would clear up and therefore did not go back to see the doctor; that he returned to work and worked one or two days more, then quit work; that he went out to his football practice and while on the field one day around the last of August, an adjuster for the insurer approached him and they discussed his injury and a settlement of his case; that at that time the adjuster showed him the report from Dr. Brown. Vineyard testified as to his conversation:

"Q. And did you and he have a conversation at that time? A. Yes sir.

"Q. What was that conversation about? A. Well, he showed me this settlement agreement, the agreement that they wanted me to read over and sign. We discussed the amount of money that was to close the case off of the books. That is what he wanted to do.

"Q. What amount of money was agreed upon? A. $75.00.

"Q. Now, how did you happen to agree to the sum of $75.00? A. Well, he figured out that I lost approximately two weeks work and figured it at sixty percent of my normal wage, I believe is the way he figured it, and that didn't come out to quite $75.00. It lacked eight or ten dollars, something like that, and he said that he would just throw in the remainder of that, just to make it a round figure.

"Q. And at that time did you and he agree to the $75.00? A. Yes, sir; we did.

"Q. Now, did he show you anything or show you any papers of any kind? A. Yes, he did.

"Q. What did he show you? A. Well, he had a typewritten copy of Dr. Brown's statement with him, and also these forms that he wanted me to sign, these agreement forms.

"Q. He had a typewritten statement of Dr. Brown's? A. Yes, sir.

"Q. Did he give you the statement? A. I read it, yes.

"Q. You read the statement? A. Yes, sir.

"Q. What did the statement say? A. Well, it has been three years ago. I couldn't say exactly what it said, but it was the same thing that Dr. Brown had told me in his office, that I had lumbago or a sprained back, or something of that sort, and it would clear up within two or three weeks, that it was nothing serious.

"Q. Why did you enter into the settlement agreement at that time? A. Because Dr. Brown told me there was nothing wrong with me, and that it would clear up in three or four weeks.

"Q. All right. A. And that I would be all right, perfectly all right as soon as that was over, and that is the reason I settled it.

"Q. Did you rely upon what Dr. Brown had told you at the time of the examination, and did you rely on what was in the statement? A. Yes, sir.

"Q. That the adjuster had, in entering into the settlement agreement? A. Yes sir, I relied wholly on that.

"Q. You say you relied wholly on that? A. Yes sir.

"Q. Would you have entered into and made that settlement agreement if the statements that Dr. Brown had made about your condition had not

been made or said? A. No sir, I would not."

Vineyard further testified that his back did not get better, but got worse until he went to Dr. Butte in Dallas who performed a surgical fusion operation on him.

Dr. Butte testified in substance that Vineyard was referred to him in September 1949 by Dr. Donoghay of Sherman, and that he (Butte) saw him thereafter for eight or nine months; supplied him with a spine support and talked with him about an operation. Dr. Butte further testified: That "Vineyard had a congenital weakness in his back, the lumbar vertebra being displaced forward on the upper surface of the sacrum a good inch; that the displacement is a developmental defect or a congenital defect with this amount of slipping, this amount of degeneration of the lumbar sacral disc, is bound to have been there for a long long time in my opinion. * * * The underlying trouble was the congenital defect in his fifth lumbar vertebra and the forward slipping of the vertebra because of these defects." That such condition "has existed ever since his birth or early childhood * * *." He further testified:

"A. Well, I think he did have a back sprain. It was probably not a serious back sprain or he would have actually been laid up. As I· said awhile ago, this type of back that has the congenital weakness and the forward slipping of the fifth lumbar vertebra is subject to relatively easy sprains, or it sprains easily, and these people have off and on episodes of low back pain, mild or moderate, depending on how much sprain they get, and they usually get over a number of sprains before they get bad enough to have to be operated on.

"Q. Well, then, would you say then, to interpret your remarks, that would be an accurate prognosis or diagnosis of his condition? A. That he had a relatively minor back sprain?

"Q. Yes, sir, of some two or three weeks duration, after outlining the work he did and the nature of his activities, beginning a week after the sprain? A. Yes, I would say yes, but without X-rays one wouldn't know really the underlying trouble in his back.

"Q. What was the underlying trouble in his back, doctor? A. The underlying trouble was the congenital defect in his fifth lumbar vertebra and the forward slipping of that vertebra because of these defects.

"Q. In your opinion, were these congenital defects caused by this back sprain in August of '1949? A. No.

"Q. In your opinion, was this condition that you saw in that X-ray there on September 23, 1949, a displacement of approximately an inch forward of the fifth lumbar on the sacrum, was it caused or brought about by this back sprain on August 10? A. No.

"Q. Would you, doctor, expect a man in that condition that you found this back in on September 23, 1949, with a forward displacement of almost an inch, would you expect him to be able to continue to play or go through the form of a football season, preliminary practice for any length of time? A. No.

"Q. Does the history, the information that you know about, relate and fall into an actual medical rule which relates to this congenital and this many repeated slippings which are not brought about or caused by this one accident here on August 10, 1949? A. If I understand your question right, I think the answer is yes, but it is a kind of long question."

Dr. Schoolfield testified for Vineyard substantially the same as Dr. Butte, and in addition:

"Q. I am not going to show you the other X-rays that I put in there, but I will ask you if all the other X-rays that you have seen, would the conditions existing in those X-rays be likely

to cause pain in the individual? A. Yes, I think probably maybe less so after the fusion operation than before.

"Q. There would still be some— A. There should be less pain following the fusion operation.

"Q. Would there, in your opinion, be any limitation in the ability of that person to perform and do labor? A. I think it is very considerable.

"Q. To what extent after the operation was made, do you think there would be a limitation in the individual to perform and do labor? A. Well, I don't think he could do that consistently. He might try a little, but I doubt if he could hold down a job doing that kind of work.

"Q. What kind of work is that, sir? A. Heavy work.

"Q. Heavy work? A. Where you have to do lifting and bending and so forth.

"Q. Could he lift hundred pound sacks? A. I wouldn't say that he couldn't, but I don't think he would enjoy it very much."

Dr. Schoolfield also testified that in his opinion Vineyard was totally and permanently disabled by reason of the condition in his back.

Vineyard's mother and father, as witnesses, testified that up to August 10, 1949 Vineyard enjoyed excellent health, but after his injury he was not the same boy; he lost weight and up to the time of his operation his condition grew worse; that since the operation he has improved only slightly; that he wears a brace every day. The football coach at his school testified to substantially the same facts. At the time of the trial a fellow-employee of Vineyard testified that Vineyard could not do heavy lifting on his present job; that his movements were slow; he wore a brace every day and would become fatigued after being on his feet all day.

In our opinion under the above evidence the Association was charged with the correctness of the statement of Dr. Brown when it used such statement in making the settlement, and the evidence here raises the issue as to the correctness of such statement for the jury. Texas State Highway Dept. v. Kinsler, Tex.Civ.App., 230 S.W.2d 364; Continental Cas. Co. v. Lynch, Tex. Civ.App., 257 S.W.2d 778; Associated Employers Lloyds v. Aiken, Tex.Civ.App., 201 S.W.2d 856, ref. n. r. e.; Jones v. Traders & Gen. Ins. Co., Tex.Civ.App., 188 S.W.2d 739; Duncan v. Texas Employers' Ins. Ass'n, Tex.Civ.App., 105 S.W.2d 403. See also Art. 8306, § 12f, Vernon's Ann.Civ.St.

This case differs from Bullock v. Texas Employers' Ins. Ass'n, Tex.Civ.App., 254 S.W.2d 554, cited by appellant. The doctor in the Bullock case was the doctor of the employee; here, as stated above, the doctor was not the doctor of employee Vineyard, but the doctor of his (Vineyard's) employer. The use of the employer's doctor's first oral opinion and later his written statement by the insurer to influence the settlement, and as asserted by Vineyard, did influence him to his damage, was in effect an adoption by the insurer of the statements of such employer's doctor, and made such statements binding on the insurer in the settlement with Vineyard.

In Gibson v. Employers' Liability Assur. Corp., Tex.Civ.App., 131 S.W.2d 327, writ ref., Gibson, as employee, settled with the compensation insurer of his employer. The doctor whose statement was used by the insurer's claim agent was Dr. Collom. In passing on the question of the doctor being the agent of the insurer, the court there stated they assumed his statements to be true and material. The facts in chronological order were that on the date of the accident Gibson was carried to Dr. Beck. Over a month later he was sent by Mr. Allen, his employer's manager, and Mr. Mahon, his employer's superintendent of sales, to Dr. Collom, and thereafter until the settlement he was under the treatment of both doctors. Dr. Beck and Dr. Collom were not associated in the practice of medi-

cine. When the insurer offered Gibson $300 to settle his claim, he asked Dr. Collom what he thought of the offer. Dr. Collom advised him to make the settlement; that he would soon be over his present condition, would be able to do light work, and that he was suffering from no broken bones and no permanent injuries. Gibson alleged such representations were false. The opinion of the Texarkana Court of Civil Appeals states there is no evidence that Dr. Collom was ever employed by insurer, and further that it was not there contended that Gibson consulted Dr. Collom at the suggestion of the insurer's agent, or that they knew he was going to consult Dr. Collom. The opinion shows there was no contention there made that Dr. Collom was the agent of the employer. That question was not raised, was not before the court, and was not passed on by the court. In our opinion such case is not authoritative here.

Commercial Cas. Ins. Co. v. Hilton, 126 Tex. 497, 87 S.W.2d 1081, cited by appellee, holds under the facts there Dr. Jenkins was not the agent of the employer or the insurer, but was appointed by the Industrial Accident Board and was not such an agent of said Board in the sense that the doctrine of respondeat superior would apply. The Industrial Accident Board acted on its own. It is clear that there the doctor was not the agent of the employee, the employer, or the insurer, and the case is therefore not in point here.

After reviewing the authorities we are of the opinion that the doctor was not the agent of Vineyard, but was the agent of the employer, and when the agent of the insurance company used the doctor's statement, it was charged with the truthfulness of such statement in that it was a representation to Vineyard as to his condition.

It therefore follows that since the evidence raised jury issues on the pleaded issues of legal fraud in procurement of the settlement agreement, that the court's instruction was in error.

Appellant's points are therefore sustained; the Association's counterpoints over-

ruled; the trial court's judgment reversed; and the cause remanded to the trial court for a new trial.

Reversed and remanded.

DIXON, C. J., not sitting.