**ARGONAUT SOUTHWEST INSURANCE COMPANY, Appellant,**

v.

**John E. MORRIS, Jr., Appellee.**

**No. 11545.**

Court of Civil Appeals of Texas.

Austin.

Nov. 8, 1967.

Rehearing Denied Nov. 29, 1967.

L. W. Anderson, Dallas, C. C. Small, Jr., Austin, for appellant.

J. Hubert Lee, Austin, for appellee.

HUGHES, Justice.

This is a workmen's compensation case in which the insurer, Argonaut Southwest Insurance Company is appellant and the employe, John E. Morris, Jr., is appellee.

Previously overruled by us is a motion filed by appellee to dismiss this appeal for want of jurisdiction. We will now state the reasons for denying this motion.

The final judgment was signed and entered January 31, 1967. Appellant filed a motion for new trial February 6, 1967. February 28, 1967, appellant filed an amended motion for new trial.

On March 21, 1967, appellant filed a motion asking that its amended motion for new trial be considered as timely filed for the reason that since the last day for filing, February 26, fell on Sunday that Monday February 27th would be the last day for filing and that it, on February 25, 1967, prepared and mailed to the clerk of the trial court by depositing the same in the United States mail its amended motion for a new trial, but that for some reason this amended motion was not received by the clerk until February 28, 1967.

This motion, of March 21, 1967, was granted by the trial judge.

The amended motion for a new trial was overruled by order signed March 22, 1967.

Notice of appeal was given in this order and a separate notice of appeal was filed March 27, 1967. Appeal bond was filed March 31, 1967. The record was filed in this Court on May 4, 1967.

■ Rule 329b requires an amended motion for new trial to be filed within 20 days after the original motion for new trial is filed. We agree with appellee that appellant's motion that the amended motion for new trial be considered as having been timely filed is insufficient to sustain the order of the trial judge granting such motion. It is agreed that the factual allegations of the motion constitute the only evidence offered to support the motion. It was also agreed that such factual allegations should be considered as evidence.

These allegations do not comply with the requirements of Rule 5, Texas Rules of Civil Procedure, namely, that the motion be sent by first class mail in an envelope or wrapper properly addressed and stamped, and the envelope or wrapper containing same bears a postmark showing a timely deposit.

■ Disregarding the amended motion for a new trial and considering only the original motion for a new trial, Rule 329b provides that such motion shall, if nothing else transpires, be overruled by operation of law 45 days after the same is filed. Here, nothing within the rule transpired after the original motion was filed and it was overruled 45 days after it was filed, to wit, March 23, 1967.

■ As shown above, the necessary appellate steps were timely taken after March 23, 1967.

Appellee also says that since appellant gave notice of appeal from the judgment and from the order overruling its amended motion for a new trial that it has restricted its appeal in some manner. An appeal is from the judgment or some portion of it and not from the order overruling a motion for new trial. Rule 353(b) T.R.C.P.

The trial was to the court without a jury. Judgment was rendered for appellee for total and permanent disability.

Appellant's first point is that the trial court erred in permitting appellee to testify to statements made to him by Doctors B. F. Simms and Robert Farris regarding his physical condition, appellant objecting that such statements were hearsay. Upon such objections being overruled, appellee testified at length to statements attributed to these doctors concerning his physical condition.

It is quite true that unsworn, out of court statements made by doctors with reference to the physical conditions of their patients is hearsay and inadmissible. Traders and General Insurance Company v. Wheeler, 271 S.W.2d 679, Tex.Civ.App. El Paso, writ ref. n. r. e. It is equally true that such statements in the nature of admissions against interest are admissible against a principal when made by an agent within the scope of his duties. Texas Law of Evidence, 2nd ed., McCormick and Ray, Vol. 2, Sec. 1164. 31A C.J.S. Evidence § 343, p. 834.

Appellant has admitted that it requested Dr. Simms to examine appellee and that it received reports from Dr. Farris regarding the condition of appellee. There is evidence that the doctors to whom appellee's employer sent him were Doctors Simms and Paulsen and that they sent him to Dr. Farris.

The admissions and testimony are sufficient to support an implied finding that the doctors named were agents of appellant. It is our opinion that the statements made by these doctors regarding the physical condition of appellee were admissible. See Vineyard v. Texas Employers' Ins. Association, 263 S.W.2d 675, Tex. Civ.App. Dallas, writ ref. n. r. e.; Bituminous Casualty Corporation v. Jordan, 351 S.W.2d 559, Tex.Civ.App. Waco, n. w. h.

Point one is overruled.

The second point of appellant is that the trial court erred in receiving in evidence the payroll records of appellant relating to Halden Lloyd Holstien in order to prove the wage rate of appellee under subdivision (2) of Sec. 1 of Art. 8309, V.T.C.S., for the reason that there was no evidence that Mr. Holstien had worked in Austin or in a neighboring place for 210 days during the year immediately preceding the date of appellee's accident.

Appellee was employed by the Cecil Ruby Construction Company in Austin, Texas, when he was injured in the scope of his employment on September 14, 1965. He had not worked in the employment in which he was working at the time of his injury for the same or a different employer for 210 days during the year immediately preceding his injury. Sub. (2), supra, provides that in such case an employee's average weekly wage should be calculated from the average weekly wage or salary of an employee of the same class working 210 days in the year immediately preceding in the same or similar employment "in the same or a neighboring place."

In attempting to make the requisite proof under this subdivision, appellee called the payroll clerk of the Cecil Ruby Company, Mrs. Sarah Darby Holland, who lived in Austin. We quote from her testimony:

"Q I will ask you if you brought with you the record of any employee of the Cecil Ruby Company that does a similar work to the work done by John Morris, namely a truck driver, driving those large highway con-

struction trucks? Did you bring the record of another employee?

A I brought the records of another one as close as I could to this man.

Q What does that man do?

A He is a truck driver.

Q The same type of trucks?

A Yes.

Q Has he worked for the company for a year or more before September 14, 1965?

A Yes, sir.

Q Do you have that record with you?

A Yes, sir.

Q Does that employee work in the same area as John Morris did?

A He has worked in the same area and other areas also.

Q And at the time between—the year just before September of 1965, his job was about the same as John Morris?

A Yes, sir.

Q And he was paid out of the same office as John Morris was?

A Yes, sir.

Q And he was driving whatever truck that he had driven in the same way that John Morris would have to do?

A Yes, sir.

Q And that is in Travis County and other surrounding territory, is that right, both of them?

A Yes, sir, wherever they were working.

Q Wherever they were sent?

A Yes.

Q Where is the company based—the main office of this company, the Cecil Ruby Construction Company?

A In the Brown Building, 907 Brown Building.

Q 907 Brown Building, Austin, Texas?

A Yes."

On cross examination by appellant, Mrs. Holland testified:

"Q Mrs. Holland, Cecil Ruby and Company, Inc., is your employer, is that correct?

A Yes.

Q They have jobs pending in numerous parts of the state, do they not?

A Yes, sir.

Q I believe actually most of your operations now are in Dallas. Isn't that true?

A Yes, but in other places, also.

Q Yes, I understand. In fact, during this time Mr. Holstien worked for you, you had operations in Big Spring and San Marcos and Dallas and all over the state; isn't that right?

A Yes.

Q I believe that's all."

On redirect examination, she testified:

"Q Mrs. Holland, I will ask you if the wages that are paid are the same whether the man traveled to Dallas or stayed in Travis County?

A The wages are based on the Federal wage requirements and the men are paid according to the wage scale on each project that is awarded to our company, and then some of the men who have been with us and are good employees make more than that wage scale.

Q But what I was trying to arrive at is whether the wages in Dallas or Big Spring or whatever are different than in Austin?

A No, that has no bearing on what the man makes.

Q So far as the location of the job, they are paid the same wages?

A Yes."

The payroll record of Mr. Holstien was admitted in evidence. It shows that his address was given as Edna, Texas. There is a line on the record under which these printed words appear "Dept. or Place of Work." This line is blank.

The trial court made this finding:

"That Plaintiff had not worked for at least 210 days during the year immediately preceding the date of his injury but that there was an employee of the same class as Plaintiff employed in the same or similar employment as Plaintiff, in the same or neighboring place who did work at least 210 days of the year immediately preceding the date of Plaintiff's accidental injury on September 14, 1965, and that such employee was Haldon Lloyd Holstien, and that his average weekly wages were not less than $70.00 per week."

Mrs. Holland in explaining these records testified that they reflected the regular weekly pay of Mr. Holstien, his overtime and his gross weekly pay, and that a week was from Sunday through Saturday.

The record reflects that Mr. Holstien earned $1.50 an hour regular pay and that his overtime pay was $2.25 an hour. The regular pay earned during a full week was shown to be $60.00. The amount of overtime pay varied.

If we assume that the $60.00 weekly regular pay was for a five day, eight hour a day week (8 x $1.50 x 5 = $60.00) then the records show that Mr. Holstien worked 209 days in the year immediately preceding the injury of appellee.

■ While much overtime is shown, there are two weeks where overtime earnings were large, too large, in reason, to have been earned except by working on Saturday or Sunday. In the week ending October 24, 1964, Mr. Holstien earned $60.00 regular pay and $52.87 overtime pay. In the week ending March 6, 1965, he earned $60.00 regular pay and $58.50 overtime pay. To have earned $58.50 overtime in five days Mr. Holstien would have had to work on the average of more than 5 hours overtime each day. This is an unreasonable assumption. We believe that the fact finder, the trial judge, had the right to infer from the evidence that Mr. Holstien worked at least 210 days in the year immediately preceding the date of appellee's injury in the same or similar employment as appellee worked.

It remains to be determined whether Mr. Holstien worked in a "neighboring place."

We believe that the principle of Commercial Standard Ins. Co. v. Brock, 167 S.W.2d 281, Tex.Civ.App. Amarillo, writ ref. w. o. m., requires an affirmative answer to this question.

In that case the employe was injured in Lipscomb County, Texas. He lived in Seminole, Oklahoma. His employer was engaged in oil field contract labor in Oklahoma. When injured, the employe was engaged in moving oil field machinery in special trucks from Garden City, Kansas to Odessa, Texas, a distance of 485 miles. In proving his weekly wage rate the employe used the employment of a worker from Seminole, Oklahoma, who, while working for a different employer, was engaged in the same kind of work as the employe performed. Seminole, Oklahoma is something over 200 miles from Lipscomb County, Texas. We quote from the opinion of the Court which recites other facts in connection with its holding that the proof was sufficient:

"The appellant contends, first, that the wages or salary of Poling was not a cor-

rect measure because his work was not performed in the same or a neighboring place as that of appellee, and asserts that the phrase 'in the same or neighboring place' refers to the place of the accident, in this case, Lipscomb County, and not to some other place where the appellee or Poling may have worked. Under the facts presented, we think such a restricted meaning of this phrase is not applicable. The expression 'neighboring place' is obviously a relative term and the purpose and import of its use are to be known from the context. What would not constitute a neighboring place in one instance might do so in another. * * * Therefore, the circumstances under which the term is applied must be considered in each case. In this case we have extraordinary circumstances. The work of the appellee and of Poling and his associates was of an unusual type and character and extended over considerable territory, including several States. It was not of a local character, and, with the exception of appellee's passing through the place of the accident, so far as the record reveals, such work was not performed in Lipscomb County or in that immediate vicinity. Under such conditions, we are of the opinion that the meaning of the term must be given a larger and a more appropriate interpretation."

This case was followed by the Eastland Court of Civil Appeals in Texas Employers' Insurance Association v. Goforth, 307 S.W.2d 610, writ ref. n. r. e., where the Court held that the employe, an oil field roughneck and driller, injured while working in Stonewall County could establish his wage rate under subdivision 2, supra, by showing that a workman of the same class worked in Stephens, Callahan and Stonewall Counties and in "East Texas" for the requisite number of days. Only the work in "East Texas" was challenged as not being a "neighboring place" to Stonewall County in West Texas. After citing the Brock case, the Court stated:

"The record in this case indicates that the oil field workers involved were engaged in work which, like the oil field machinery removing work in the above cited case, was transitory and extended over a large territory. The evidence shows that Goforth was being paid at approximately the same rate per hour for the work he performed as a roughneck that Lewis was being paid for the same type of work and that the wages paid in each of the counties involved were the same. We are unable to see how appellant could be injured by an application of the same liberal rule used in the Brock case in identifying and determining the extent or breadth of 'a neighboring place'."

Similarly here, the work of the Ruby Construction Company was carried on at various places over the State, presumably at places where construction jobs were obtained. The work, the trucks and the wages were the same regardless of where the employe was situated. The locale of the job was of no relevance. Under these circumstances, we conclude that a neighboring place, under the facts of this case, includes places where the same employer conducts the same type of business under the same conditions and the conditions of employment are the same.

In reaching this conclusion we are also aided by the rule that a liberal construction of the Workmen's Compensation Act requires but slight proof of the applicable wage rate where, as here, there is no real controversy over it. American General Insurance Company v. Hightower, 279 S.W.2d 397, Tex.Civ.App. Eastland, writ ref. n. r. e.

We overrule the second point.

Appellant's points three and four, jointly briefed, are to the effect that the trial court erred in considering evidence to sustain a finding of $70.00 per week as a just and fair wage under subdivision 3 of Sec. 1 of Art. 8309, supra, since the

applicability of subdivision 2 of such article had not been negated.

We have held that the evidence supports the findings of the trial court with reference to the application of subdivision 2 of Art. 8309, Sec. 1, which holding makes moot these points. They are not decided.

 The fifth point of appellant is that the finding of the trial court that appellee was totally and permanently disabled is not supported by any evidence and, alternatively, is against the great weight and preponderance of the evidence as to be clearly wrong and unjust.

We overrule this point.

We copy, in full, appellant's statement under this point:

"The Plaintiff admitted at the suggestion and the leading question of his attorney that he was able to do light work. Dr. Jerry D. Julian had testified that in his opinion he was able to do work of driving a truck, as the result of his examination of the Plaintiff. Dr. Maurice Jacobs the physician to whom the Plaintiff had gone immediately following the alleged accident, and who had treated the Plaintiff on three (3) occasions prior to this for his previous back injuries, testified, in his opinion that when he saw him on September 18, 1965, which was three (3) days after the alleged accident, the Plaintiff would be able to return to work as a truck driver and the most he should be off as the result of the alleged accident was two (2) or three (3) weeks. Even Dr. Warran A. Ross, the physician to whom his attorney sent him, testified that in his opinion the Plaintiff might have some pain but he could do the work of a truck driver."

The reference to the testimony of Dr. Ross with regard to the ability of appellee to drive a truck is quoted below:

"Q Will you state now, in view of the reports that I have, that you have seen and that you have made, on review of them whether you have any opinion as to whether or not John Morris is able at this time to do any heavy lifting?

A I would strongly not recommend it.

Q And would he be able to do any material twisting, such, for example, as taking a wheelbarrow load of dirt and turning it over into a dump?

A I wouldn't advise him to do this continuously throughout the day, no, sir.

Q And in your opinion—do you have an opinion about whether or not John Morris can do any heavy lifting at this time?

A I would recommend that he do nothing that would require prolonged use of his back for lifting, bending, twisting, stooping or straining.

Q Now, Dr. Ross, assuming that the driving of these trucks, highway trucks, such as John Morris was driving previously, requires a substantial and continuous amount of heavy twisting of the wheels and heavy pulling of the levers and controlling of the trucks, and heavy pressing of the feet on the brakes, do you have any opinion as to whether that sort of continuous activity would—whether he could do it without pain?

A He could, but for how long, I don't know. In other words, if he persisted in it, he would have pain, and he would have pain of such a severe degree that he would have to quit.

Q So that actually he could not do the work regularly?

A If it's the type of truck that I would be familiar with, not being a truck-driver any more, I couldn't say much more about that. Again I limit

my qualifications to the medical aspects that the man should not do any *prolonged* lifting, bending, squatting, stooping, straining or twisting of his back.

Q And, now, do you consider that to be a permanent condition?

A Yes, sir.

Q Maybe I should ask you in another way, Doctor: Do you have an opinion as to whether it would be—that condition would be permanent?

A His injury that he has there?

Q Yes, and disability to do the twisting and bending and stooping and lifting that you have described?

A Yes, sir; it is permanent."

The so-called admission of appellee that he could do light work was derived from the following testimony of appellee:

"Q Can you bend backwards or forwards reasonably well when you have the brace on?

A I have not tried to bend backwards, but I have tried to bend forwards.

Q You can bend forwards?

A Yes, sir, reasonably.

Q Do you have any difficulty in picking up anything heavy and twisting from your waist?

A I try not to pick up anything heavy, not over ten to fifteen pounds.

Q Have you had any pain of any kind in connection with trying to do any strenuous exercise or lifting?

A Yes, sir.

Q Tell us how. Do you remember any particular instance?

A When I bend down on my exercise, I get pain in my back, and when I cut the yard, I get pain in my back and my legs, and so I quit and rest a while, and then work a while, and then keep on doing that until I finish the yard.

Q Are you willing to do some kind of light work that you could do if you could find it?

A Yes, sir.

Q Have you looked for it?

A Yes, sir.

Q Have you found it?

A No, sir."

Appellee was a truck driver. The truck he drove was a tandem type. Its cab had four wheels. The tandem trailer had twelve wheels, six double wheels. The truck had a flat and while it was being repaired it was noticed that a brake drum was cracked and a new one had to be installed. While helping another employe carry this brake drum, which weighed about 100 lbs., the employe, so appellee testified, dropped his end of the drum and in picking it up and carrying it to the truck, appellee strained and injured his back. Two employes who were present when this incident occurred testified that appellee dropped the drum.

Appellee described driving the truck as follows:

"Q Will you state to the Court whether managing these large trucks and driving them requires you to exercise any strength from your waist and your legs and your arms?

A Yes, it does.

Q Describe how and to what extent and why.

A You have to use your right leg for the gas and for the brakes, and your left leg is for the clutch, and you use your arms for the twisting and turning of the steering wheel. If you are going up a steep hill and

you have to change gears awfully fast and the road is bumpy, you bounce up so, and you have to keep wrestling with the steering wheel and have to change gears fast enough to keep from rolling back down the hill.

Q Does the weight of the load have anything to do with that, the fact that it is a heavy truck or heavy load?

A Not exactly. The weight of the load sometimes makes it go smoother, and other times, if the road is pretty bumpy, it is rough anyway.

Q In turning corners, are you required to make any more or less exertion than driving straight?

A Yes, you do.

Q Do you have to exert any strength from your waist?

A Yes, you have to wrestle with that steering wheel.

Q How many shifts does a truck like that have?

A This one has five forward and one reverse."

Dr. Jerry. D. Julian, an orthopedic surgeon, was a witness for appellant. He testified that he examined appellee one time, June 1, 1966, for appellant. He stated that appellee had a slight pelvic obliquity with the right side elevated and the left compensatory lower thoracic upper lumbar scoliosis. That the range of motion of the lumbar spine was limited; that there was subjective tenderness in the lower thoracic and upper sacral area but no demonstrable paravertebral muscle spasm; that the left leg was two (2) centimeters shorter than the right and that the thigh circumference was 48 centimeters on the right and 47 on the left; that there was a hamstring muscle tightness to 40 degrees bilaterally which is usually associated with discomfort on the part of the patient; that

his x-rays showed a grade one spondylolisthesis with approximately one centimeter of anterior displacement of the body of L–5 on S–1. That there appeared to be an increased sclerosis about the lumbo sacral facets. That the spondylolisthesis grade one, means a forward displacement of the last lumbar vertebra on the first sacral vertebra. That this was a congenital defect.

Dr. Julian also testified that a person with a spondylolisthesis may in all honesty suffer several separate injuries to his back because he has got this spondylolisthesis situation, and that it is probably true that a person with a good back does not get injured as often as a person with a spondylolisthesis, and that with respect to muscle spasms there are periods of remission when the muscle spasms are not evident and that the fact that the doctor did not detect muscle spasms on the occasion of his examination did not mean that appellee had not had muscle spasms within recent times.

Dr. Julian further testified that you could have the sprain being chronic without the necessity of a displacement of any of the vertebrae of the back, if it is a low back sprain; that a person with a low back spondylolisthesis does render his back more susceptible to low back sprains and chronic sprains.

Dr. Julian also testified:

"Q Now, do you ever find any situation in which a sprain may become chronic and so affect the individual that he really would not be able to return to the type of work that he was doing before, if his work involved lifting heavy weights, twisting heavy wheels on heavy trucks, and that sort of thing?

A It is possible.

Q I will ask you if you could deny and rule out that John Morris' back is in that condition?

A I could not deny it with complete certainty."

Dr. Maurice Jacobs, an orthopedic surgeon, testified for appellant. He examined appellee on the day following his injury. We quote from his testimony:

"Q On that occasion, was he again complaining of a backache or back pain in the same area for which you had treated him before on these two previous occasions?

A Yes.

Q Did you or not take any x-rays of him at that time?

A No, I did not take any x-rays.

Q Did you give him any treatment?

A Yes.

Q What type of treatment did you give him?

A I prescribed some muscle relaxant pills and some pain medicine, too.

Q Did you prescribe a back brace at that time or not?

A I have no note here of having prescribed a back brace.

Q Did you consider that he had a serious injury and would have any permanent injury as a result of the condition which you treated him for as a result of this accident in September of 1965?

A No.

Q Doctor, when was the last time you saw him after you treated him in September, 1965?

A September 18, 1965.

Q And the last time you saw him, did you or not think that his physical condition would improve so that he could return to work as a truck driver?

A Yes.

Q. What is your opinion as to how long you think he should have remained off work as a result of the injury or alleged injury in September of 1965?

A About two or three weeks."

On cross examination, he testified:

"Q If he suffered any disability by reason of having been injured in September, 1965, the last time he went to see you, would you attribute that disability to the injury that he suffered in September of 1965? In other words, when he came to see you in September of 1965, if he had any disability after that accident of September, 1965, would you attribute that disability to that accident or the injury suffered at that accident?

A In other words, was this a fresh injury in September?

Q Yes, sir.

A Well, I would assume that, yes, if he worked for several months without complaining of pain, and then had a new complaint of pain and recalled an injury to it, I would say this was a fresh injury."

Dr. Warran A. Ross, a medical doctor, specializing in orthopedics, testified for appellee. Dr. Ross saw appellee about February 4, 1966, the first time, and treated him thereafter to the time of trial. Dr. Ross examined him on February 4, 1966, neurologically and also took x-rays of appellee's spine and lower back. Dr. Ross found a forward displacement of the vertebral body of L–5 on the sacrum and an increased lumbosacral angle of 55 degrees. He also found structural deformities of the low lumbar level at L–4, 5 and the sacrum, and the pelvic crest was level with the spine of L–3. The right and left oblique projections demonstrate extreme narrowing of the pars-interarticularis at L–5 and more apparent loss of continuity on the right than on the left.

Dr. Ross' diagnosis was acute and chronic lumbar strain; structural instability, lumbar

spine; that the acute and chronic lumbar strain was referable to the ligaments of the lower back; that the x-ray evidence was his primary basis for diagnosing the structural instability of the lumbar spine. Dr. Ross stated that he found muscle spasms on appellee when he examined him in February of 1966.

Dr. Ross also stated that the structural instability was not caused by a sudden traumatic incident and that the previous injuries that he may have sustained would not be the cause of his structural instability.

He also testified that these prior accidents did not contribute to the present disability, that the structural disability of the lumbar spine was a permanent condition, which has likely been that way for many years and was not caused by an acute traumatic condition. Dr. Ross further stated that the relaxation of these torn ligaments is permanent.

We have previously recited the testimony of Dr. Ross to the effect that the disability of appellee to perform the usual duties of a truck driver was permanent.

After appellee was injured he, at the suggestion of Dr. Simms, returned to his job and resumed driving a truck. After a very short time, the same day, he had to quit because of pain.

Appellee testified that he applied for work at several places but was unsuccessful in obtaining it.

There is much more evidence in the record regarding the injury of appellee, its extent and permanency and we have, as duty requires and as appellant suggests, examined all the evidence very closely in order to determine this point. We are of the opinion that the evidence is legally and factually sufficient, and that this point should be and is overruled.

Appellant cites no cases considered factually in point in its favor. Appellee cites several cases as factually supporting its position. Since the facts of these cases differ from those found here, a review of them would not be fruitful.

■ The sixth point of appellant is that the trial court erred in finding that prior compensable injuries sustained by appellee did not contribute to his present disability because such finding was not supported by any evidence and was against the great weight and preponderance of the evidence so as to be clearly wrong and unjust.

Appellee testified that he had sustained a back injury in 1958, that he received medical treatment for it but was not compensated under the Workmen's Compensation Law for it. He next sustained an injury to his back in 1959. He received medical treatment for this injury. His claim before the Industrial Accident Board was settled after he had not worked for four or five months. He next was injured in 1961, received medical treatment, did not work for three or four months and settled his claim for workmen's compensation benefits. He then worked for six months prior to another injury to his back in March, 1964. He received medical treatment for this injury, did not work for one year and settled his claim for workmen's compensation benefits. He commenced working for the Cecil Ruby Company in May, 1965 and sustained the injury involved in this suit on September 14, 1965, while in the same employment.

Appellee testified that he had worn back braces after his previous injuries but not the chair type brace he was now wearing.

Dr. Maurice Jacobs testified that appellee had complained of the same low back area when he treated him following injuries prior to the September, 1965 injury.

We quote the following testimony of Dr. Ross:

"Q Now, I believe you said awhile ago that whenever you have an injury to a muscle or a joint that

that creates an arthritic condition that remains the rest of their life?

A Yes, sir.

Q Now, this man had these series of injuries in this very same area that he had had this bad back, he has been treated for it, and he has collected money for it; now, each one of those occasions, if they occurred, created an arthritic condition that continued from then on, didn't it?

A Only if it involved the joints.

Q Right. Well, if there were similar claims based on these same symptoms, it would be working on the same parts of the body, and would have created these same arthritic conditions in the very same places involved in this action?

A If it involved the joint, yes, sir.

Q And if it was a complaint caused by lifting something, hurting his back, it would have created a condition each time that projected itself permanently into the future?

A Yes, sir.

Q You say that that doesn't contribute at all to his present condition?

A I said it contributes to his potential; in other words, the fact that he has an unstable back does—

Q I am talking about this arthritic condition that has set up, this inflammatory reaction of the joints.

A Well, I have no way of knowing whether he had an injury of the joints preceding this present injury. In fact, it would be most difficult to say that he has an injury of the joint at this time categorically, although it is presumed with the severity of his symptoms and the prolonged history that he gives that the injury is most likely involved.

And, therefore, if the injury does extend into the joint, then he does have an arthritic condition of that joint which will be permanent.

Q And that could very well have been the case in the prior injuries?

A Have no way of knowing. I didn't see him then.

Q You just don't know?

A That's right. * * *

Q Now, assuming this man had substantially the same symptoms on all these other occasions, if he had torn ligaments on these other three occasions, that would have created a permanent condition—

A Yes, sir.

Q —that might have contributed to his problem at this time?

A It would contribute to his weakness, but not his present incapacity.

Q But would contribute to the permanency of his present condition?

A Well, yes, I think you could say that, but not to his—I don't think you could even say that.

Q Well now,—

A Because I have no way of knowing how severe his previous injuries were. Apparently they weren't too severe because he recovered. * *

A He has been out over a year this time.

Q Right.

A So this would indicate some increased severity of this injury over the preceding injury.

Q Well, isn't that severity a result probably of the previous permanent damage that might have occurred to him?

A It is possible.

Q It is possible. So you can't say then categorically that this particular injury or transaction is the sole cause of his present permanent condition, can you?

A Yes, I can.

Q Well, you just said it was possible—

A No.

Q —that these others contributed to the permanency of his present condition.

A No; no. We are talking about two different things. You are talking about the structural condition, and I am talking about the newly acquired ligamentous condition.

Q Well, now, those ligaments could have been torn and strained in these other accidents, couldn't they?

A Sure; he could have broken his toe in these other accidents, too, but that has nothing to do with his present injury.

Q But that contributes to the permanency of it, doesn't it?

A No, sir.

Q No?

A No, sir. It contributes to the condi- of his back prior to his present injury, but not to the permanency of it. In other words, the permanency of his condition at this time is related to the permanency of the injury at this time. The permanency of the injury before has contributed to the permanency of his condition before he sustained his injury. He did recover before. * * *

Q You are saying that his previous injuries or claimed injuries wouldn't contribute at all to the continuation of the muscle spasm and the pain that he claims now exists?

A That is correct. * * *

Q If I follow you correctly then, this prior history of injury in this very same locality of his back was of no concern or interest to you whatever in making your diagnosis?

A That is correct.

Q And you didn't even consider that in making your diagnosis of the man?

A That is correct.

Q And you don't consider that any of those could have had any contributing cause to the present condition man suffers from?

A It contributed to his instability, but not to his present incapacity; that is correct. * * *

Q Well, let's go into this matter of structural instability. I believe you weren't willing to say whether that was congenital or what it was; is that correct—did I hear you right?

A. Yes, I said that it could be argued that it is a congenital condition or that it is an acquired condition, but to be acquired it would not be considered as developing from one acute episode of injury.

Q What is your best judgment on it—is it congenital or acquired?

A Well, I don't think it is really material about whether the fellow was born with this or whether he developed it because of doing heavy work over his thirty-three years of existence. I do know the x-rays show it is present, and this is the only thing that concerns me; the fact that the x-rays indicate this, the symptoms indicate that he has an injured condition in his back on the 4th of February when I first

saw him, and the history he relates is the fact that his symptoms started the 14th of September, 1965.

Q All right. Then, I take it that this structural instability was present at the time of the injury and didn't in your opinion contribute to any degree to the injury or the possibility of the injury?

A It contributed to the weakened condition of the spine, but it did not— it was not the cause of his present incapacity, no, sir.

Q It doesn't have any effect on his present incapacity?

A I don't understand what you mean by the—

Q The structural instability, does that have anything to do with the man's sore back at the present time and his complaint that his back hurts him?

A His injury is the reason that his back is hurting.

Q The injury was not caused in any respect and not influenced by the structural instability?

A I think you can say that it was influenced, but not caused by it."

In discussing point five, we set out the testimony of Dr. Julian to the effect that he could not rule out with certainty that the effect of a chronic sprain would disable a person so that he could not do the type of work which appellee was doing when injured last.

Appellant cites us to no medical testimony to the effect that the prior injuries appellee sustained contributed to his present disability. The most that the medical testimony of doctors testifying for appellant shows is that appellee had an unstable back which made him more susceptible to back injury. In fact, Dr. Jacobs testified, supra, that any disability which ap-

pellee has after September 14, 1965, would be attributed to any injury then sustained.

Appellant asserts that the findings of the trial court in this respect constitute a travesty on justice in that appellee has been paid for two or more compensable claims resulting from injuries to his back. Whatever merit there may be in this assertion is of an equitable rather than a legal nature. The Workmen's Compensation Law is purely statutory. No doubt, at times, its operation is deemed inequitable both by the employer and the employee. With these complaints, we are not judicially concerned. Our duty is to enforce the Act as written.

The evidence to support the findings, attacked here, in our opinion, preponderates in support of the findings of the trial court, and we, therefore, have no authority to disturb them. Point six is overruled.

Appellant's point seven is that the trial court erred in finding that appellee's prior physical condition was not the sole cause of his disability, because there was no evidence to support such finding and it was against the great weight and preponderance of the evidence as to be clearly wrong and unjust.

Drs. Julian and Jacobs testified and the trial court found that appellee had an unstable back and that this was a congenital condition.

Appellant contends that appellee should have pleaded and proved and the trial court should have found that this congenital condition of appellee was aggravated by the injury complained of before he was entitled to recover in this case.

The trial court found that the prior physical condition of appellee was not the sole cause of his present disability.

The trial court made no finding with respect to aggravation of appellee's infirmity, nor would this have been appro-

priate since there was neither pleading nor proof of aggravation.

We quote from Texas Jurisprudence 2d Vol. 62 Sec. 109, Workmen's Compensation, the law, as we understand it to be, which fully answers the contention of appellant:

"If a protected employee sustains an accidental injury of the character defined in the law and from which disability or death results, the injury is compensable even though the employee was at the time suffering from some disease or infirmity that rendered him more susceptible to such an injury or that aggravated or enhanced its effect. In other words, if there is a real injury, the background of the employee's peculiarities will not defeat compensation for it. The employer accepts the employee subject to the latter's condition when he enters the employment, and it is no defense to a claim for compensation that the injury would not have been as great, or that death would not have occurred, if the employee had been in a healthy condition. * * *

A claimant is precluded from recovery if the disability or death for which compensation is sought was not the direct result of the injury but was solely caused by a pre-existing disease or idiopathic condition."

Many cases are cited to sustain the text including Sowell v. Travelers Insurance Co., 374 S.W.2d 412, Tex.Sup.Ct.

See also Texas Employers' Ins. Co. Association v. Beard, 390 S.W.2d 59, Tex. Civ.App. Fort Worth, writ ref. n.r.e. where it is stated:

"In order for a prior or existing disease, impairment or condition to constitute a defense to a claim for compensation it must be established that such prior or existing disease, impairment or condition or some combination thereof standing alone is the sole cause of the the incapacity. Otherwise stated, it must be shown that such prior or existing disease, impairment or condition or combination thereof is disassociated or disconnected with and not aggravated by the injury or incapacity upon which the claim for compensation is based.

The appellant Insurance Company must plead such matter as a sole cause defense and secure favorable findings thereon. The burden of proving the negative of the sole cause issue is upon the claimant."

Appellant cites the case of Whitten v. Liberty Mutual Insurance Co., 257 F.2d 699 (5th Circuit) as holding that compensation benefits under the Texas law cannot be recovered where there is no evidence that the injury aggravated a prior condition, and as being directly in point here. As we understand this case, it merely holds that causation between the death of the employee and his employment was not shown since there was no evidence that his over exertion metastasized cancer of the prostate and was a producing cause of death as claimed.

We overrule point seven.

Point eight is that the trial court erred in admitting into evidence the typewritten reports of Dr. Ross made by him regarding the physical condition of appellee. The objection was that the reports were hearsay.

In arguing this point, appellant states, "Since apparently this was the only medical testimony upon which the court could rely in making any finding of fact of total and permanent disability, the finding was obviously in error since it was based upon incompetent evidence."

The reports of Dr. Ross were made by him shortly after each examination made by him of appellee. Some of the reports are quite lengthy. Dr. Ross testified that the reports were true and correct. Appellant had the opportunity to cross examine Dr. Ross about these reports. It did cross examine Dr. Ross.

The objection to the reports was a general objection that they were hearsay. If any portion of the reports was admissible as an exception to the hearsay rule, then a general objection to the reports in their entirety was properly overruled.

We are of the opinion that these reports of Dr. Ross fall within the purview of Art. 3737e, V.T.C.S., and were generally admissible. Goshorn v. Hattman, 387 S.W.2d 422, Tex.Civ.App. Beaumont, writ ref. n.r.e. If, as appellant contends, some portion of these records was inadmissible under the decision of the Supreme Court in Loper v. Andrews, 404 S.W.2d 300, then it was incumbent upon appellant to isolate such portion and specifically object to it.

Furthermore, the evidence recited in this opinion refutes the statement of appellant that dehors these reports there was no evidence that appellee was totally and permanently disabled. The point is overruled.

Point nine is that the trial court erred in refusing to admit in evidence two exhibits offered for impeachment purposes.

One exhibit is a letter signed by John E. Morris and by E. B. Fuller, attorney. It is a letter dated November 27, 1959, reciting that while he, appellee, was in the employ of Bob King's Humble Station and that about October 8, 1959, in the course of his employment he was helping to move a small car which was on the grease rack and about to fall. In assisting, he injured his back. It also states that the Bob King's Humble Insurance Company contends that there is a question as to whether or not he sustained an injury of any kind and that if he did, it was minor and would not result in permanent disability and that there was a possibility that the injury and disability of which he complained was congenital.

While testifying in this case, appellee was asked whether on October 8, 1959, if he didn't claim that he injured his back while working for King's Humble Service Station while holding a small car on a grease rack. He answered that he did hold a small car on the grease rack and that he thought that he filed a claim and he knows that he injured his back at that time. He stated that the signature on exhibit "1" looked like his signature. That it was the claim that he had filed with the Industrial Accident Board. It was received in evidence as Defendant's exhibit "1."

Appellee also testified that he went to Dr. Jacobs at that time but he did not remember if Dr. Jacobs told him that he had a congenital back condition. He acknowledged that he employed Mr. E. B. Fuller to represent him.

Appellant's counsel stated that he was offering this exhibit for impeachment, saying: "I asked him about what Dr. Jacobs told him about his back and so forth, and that is in here, and I will read it to you or let you read it first." Portions of it were read in evidence, but upon the instrument being offered in evidence, the court sustained the objection. There was no statement in the instrument made by Dr. Maurice Jacobs.

Appellant states that this letter was offered to impeach appellee regarding "what the doctors had told him about his prior back condition, and that it was congenital."

There is nothing in this exhibit to impeach appellee on this subject. No error was committed in excluding this proffered evidence.

The other proffered and excluded exhibit was a copy of an instrument providing for settlement for $500.00 of a previous compensation claim made by appellee for an injury while working for "Big Bear."

The record shows that appellee had made such a claim and that it had been settled. When asked whether he received $500.00 as settlement, appellee answered, "I don't think I did, I don't know it was that much."

Evidence of the amount received in settlement of a prior workmen's compensation claim is not admissible in a workmen's compensation case. St. Paul Fire and Marine Insurance Co. v. Murphree, 163 Tex. 534, 357 S.W.2d 744. It is not permissible to impeach a witness on immaterial or inadmissible matters. Point nine is overruled.

The judgment of the trial court is affirmed.

Affirmed.