DUNCAN LAND & EXPLORATION,
INC., Appellant,

v.

Tommy LITTLEPAGE, Appellee.

No. 2–97–172–CV.

Court of Appeals of Texas,
Fort Worth.

Dec. 17, 1998.

Rehearing Overruled Feb. 11, 1999.

Pat Long, Kevin D. Green, Dallas, for Appellant.

Shannon, Gracey, Ratliff & Miller, Anne Gardner, Fort Worth, Donald L. Sweatt, P.C., Donald Sweatt, Graham, for Appellee.

Before CAYCE, C.J., and LIVINGSTON and BRIGHAM, JJ.

## OPINION

LIVINGSTON, Judge.

## I. INTRODUCTION

Appellant Duncan Land & Exploration, Inc. (Duncan) appeals from the trial court's order setting aside the jury's verdict in Duncan's suit against Tommy Littlepage (Littlepage) for removal of a cloud on title and for slander of title relating to Duncan's interest in an oil and gas lease. In three points, Duncan claims the trial court erred in setting aside the verdict because there was sufficient evidence to support the jury's findings that: (1) Duncan did not cease producing gas in commercial quantities for a period of 90 days; (2) Littlepage slandered Duncan's title; and (3) Duncan was entitled to attorney's fees. Littlepage raises five cross-points in the event this court sustains Duncan's points: the jury's finding concerning cessation of production in commercial quantities is against the great weight and preponderance of the evidence; and there is factually insufficient evidence to support the jury's findings concerning a reasonably prudent operator, slander of title, damages, and attorney's fees. We sustain Duncan's points, reverse the trial court's judgment, overrule Littlepage's crosspoints, and render judgment on the jury's findings.

## II. FACTUAL BACKGROUND

In 1979, Littlepage acquired an interest in an oil and gas lease on a 40–acre tract in Young County, Texas. On August 4, 1986, Littlepage entered into a farmout agreement with Tierra Energy, Inc. (Tierra). Littlepage and Tierra executed an assignment of the oil and gas lease on December 1, 1986. Tierra drilled a well and then assigned its interest in the farmout agreement, lease, and well to Duncan in 1987. The farmout agreement contained the following provision:

X. *TERMINATION AND REVERSION*

In the event that any 20 or 40 acre tract assigned to Tierra hereunder shall fail to produce oil or gas in commercial quantities from a well situated thereon for a period of ninety (90) days, the interest of Tierra in said tract shall terminate and all interest of Tierra in and to said tract shall revert to Owner. Each assignment executed and delivered to Tierra hereunder shall contain provisions concerning such termination and reversion, and providing that such termination and reversion shall be effective upon the filing of an affidavit by Owner in the Deed Records of Young County, Texas that no commercial production of oil or gas has been obtained from such tract for a period in excess of ninety (90) days.

The lease did not contain any savings clauses. Thus, Duncan's lease terminated if: (1) there was no production in commercial quantities in excess of 90 days; and (2) Littlepage filed an affidavit asserting the lack of production in the Young County deed records.

Duncan is a small oil and gas exploration company owned by Brian and Diane Duncan. During the period relevant to this case, the Duncans ran the company from their home and utilized their personal possessions (telephone, computer, and so on) to run the business. Diane was in charge of any filings that were required by the Texas Railroad Commission (Railroad Commission). As such, Diane filed monthly P–1 reports that showed the amount of production from the well and any amount sold.

Duncan operated the well and produced in commercial quantities for several years despite intermittent salt water problems. Much of the oil was sold to Taylor Gas Company. Diane continued to file the P–1 reports, but sometimes estimated the amounts instead of getting the precise measurements from the well pumper. In 1992, Duncan discovered a downhole tubing problem that hindered production. The well also began producing "sour gas."

Then, in May 1992, a neighbor complained to the Railroad Commission about the smell of hydrogen sulfide in the area. On May 21, 1992, the Railroad Commission ordered the well "shut-in" for testing until the well complied with Statewide Rule 36, that prohibits a well from producing more than 100 parts hydrogen sulfide per million. *See* 16 TEX. ADMIN. CODE § 3.36 (effective Jan. 1, 1976), <http://www.sos.state.tx.us/tac/16/1/3/3.36. html>. The Railroad Commission first test-

ed the well in May 1992. This test revealed 92 parts hydrogen sulfide per million, which was within the parameters of Statewide Rule 36. The Railroad Commission then ordered another test, conducted in July 1992, that again revealed about 92/93 parts hydrogen sulfide per million. Thus, neither test showed results in excess of Rule 36.

However, the method used for the second test did not meet the Railroad Commission's requirements, so it ordered a third test. This third test, done October 29, 1992, again showed about 94 parts hydrogen sulfide per million. The Railroad Commission received the results of the third test on November 12, 1992, and lifted the shut-in order immediately. Duncan received notice that the shut-in order had been removed on December 2, 1992.

Despite the existence of the Railroad Commission's shut-in order, Duncan periodically operated the well during the shut-in period (May 21, 1992 to November 12, 1992) in order to produce in commercial quantities and keep the lease in effect. Duncan was able to open the well and let the oil flow for short periods because it was capable of flowing naturally without the necessity of pumping it out of the ground. At trial, both Brian and Diane testified that, if someone had looked up either the original or the amended P–1s,[1] the reports would have shown that there was production from the well throughout 1992. Both testified that there was never a 90–day period from May to October 1992 in which the well did not produce oil. Brian also testified that the lease, with a cloud on its title, could only be sold for $2,000, but that the well itself was worth $400,000 if it was reworked and producing about 50 barrels of oil a day.

After the shut-in order was lifted in November 1992, Brian Duncan renewed efforts to court investors to drill a new well on the lease property. Duncan believed the well could be more profitable if he reworked the well and/or drilled a new well a couple of yards away. In this regard, Duncan install-

ed two gas sweeteners on the existing well to solve the sour gas problem. Duncan also arranged for three friends to invest $20,000 each in exchange for a 1/8 interest in the well.

Meanwhile, in early 1992, Littlepage learned of the well's tubing and sour gas problems and asked his pumper, Hugh Ford, to keep an eye on the well and apprize him of any changes because his own well was tied to the production on Duncan's well. Littlepage learned of the shut-in order in May or June 1992 and asked his operations manager, Hugh Bedingfield, to make some inquires into the well's production. Bedingfield testified he looked up the production numbers on the computer and found that the well was producing in minimal quantities. Bedingfield related this information to Littlepage.

Some time later, apparently concluding that the well had not been producing in commercial quantities, Littlepage consulted with his attorney and then filed his affidavit of lease termination and reversion on December 23, 1992. Duncan filed a controverting affidavit on January 6, 1993. Soon thereafter, Duncan's investors pulled out, and he filed suit against Littlepage for slander of title, removal of a cloud on his title, breach of contract, and for a declaratory judgment that there had been no reversion of the leasehold. Before he was served with the lawsuit, Littlepage, through his attorney, offered to withdraw the affidavit if Duncan could get the well up and running in 60 days. Duncan declined the offer. Littlepage then counterclaimed for lost profits stemming from Duncan's failure to use Littlepage's well services as required by their contract.

At trial, Littlepage acknowledged he did not: (1) speak to Duncan before filing the affidavit; (2) personally endeavor to check the amount of gas being produced by the well; or (3) inquire as to Duncan's expenses in producing the gas. Bedingfield even acknowledged that Littlepage received a royalty check in November 1992 for gas produced from the well. Bedingfield testified that the check would have come from an October 1992

---

1. During the pendency of the suit, Duncan sent the Railroad Commission a revised set of P–1 reports for 1992 showing the actual monthly

readings, correcting the initial estimates. These reports showed slightly more production than the original reports.

sale of gas that would have been extracted from the well during the preceding months.

Littlepage also altered the position he took during his deposition—that no production existed during the period from May to December 1992—to say that, in his mind, the minimal quantities being produced amounted to no production. Littlepage testified that, whether there was no production or minimal production, he believed that the well was not producing in commercial quantity, and that a reasonably prudent operator would not have produced the well in light of the shut-in order. Littlepage's opinions were echoed by his expert witness, Larry Hulsey, who contended Duncan failed to take into consideration several expenses when making his commercial quantities calculations and opined that, in any event, a reasonably prudent operator would not have produced the well in light of the shut-in order.

Relevant to this appeal, the jury answered the following questions (certain pertinent instructions are included):

Question No.1:

Do you find that the Duncan Land & Exploration—McCluskey No. 1 Well ceased to produce in commercial quantities for any ninety (90) day period between June 1, 1992 and December 1, 1992?

. . . .

An oil and gas well has "ceased to produce oil or gas in commercial quantities" if it ceases to produce at a profit. If an oil and gas well produces a profit, even small, over operating and marketing expenses, it produces in commercial quantities, though it may never repay its cost, and the enterprise as a whole may prove unprofitable.

. . . .

Answer: "It did not cease."

. . . .

Question No. 3:

Do you find that Tommy Littlepage slandered Duncan Land & Exploration, Inc.s title to the Duncan Land & Exploration—McCluskey No. 1 Well?

As used herein slander of title means publishing false or disparaging words about Duncan Land & Exploration,

Inc.'s title with reckless disregard for the rights of Duncan Land & Exploration, Inc., thereby causing a specific loss of a sale or sales.

. . . .

Answer: Yes.

. . . .

Question No. 4:

What damages, if any, do you find were caused by Tommy Littlepage's slander of Duncan Land & Exploration Inc.'s title to the Duncan Land & Exploration—McCluskey No. 1 Well?

. . . .

You are instructed that the amount of damages, if any, to be awarded should be those damages which would compensate Duncan Land & Exploration, Inc. for the loss or prejudice suffered as a result of the slander of title.

. . . .

Answer: $39,000.

. . . .

Question No. 13:

What is the reasonable fee for the necessary services of Duncan Land & Exploration, Inc.'s attorney in this case, stated in dollars and cents?

a. For preparation and trial.

Answer: $41,500.

b. For an appeal to the Court of Appeals.

Answer: $10,000.

c. For making or responding to an application for writ of error to the Supreme Court of Texas.

Answer: $5,000.

d. If application for writ of error is granted by the Supreme Court of Texas.

Answer: $2,500.

The trial court rendered judgment on the jury's verdict on September 20, 1996, and entered its final judgment on January 13, 1997, awarding Duncan: (1) $39,000 in actual damages and $56,458.75 in prejudgment interest; (2) title to its interest in the leasehold; and (3) $57,500 for accrued and future attorneys fees. On January 22, 1997, the trial court issued its corrected judgment re-

ducing the amount of prejudgment interest to $17,458.75.

Littlepage filed his motion for new trial and alternative motion to modify, correct, and reform the judgment on February 12, 1997, and his first amended motion on February 20, 1997, claiming error regarding: (1) the admission and exclusion of evidence; (2) the charge; (3) the lack of evidence to sustain the verdict; (4) the weight of evidence to sustain the verdict; (5) attorney's fees; and (6) prejudgment interest.

Duncan filed its answer to Littlepage's motion on March 18, 1997, and Littlepage submitted his brief in support of his motion on March 27, 1997. In his brief, Littlepage contended: (1) Duncan's production in violation of the shut-in order was against public policy, precluding it from establishing production in commercial quantities as a matter of law; (2) there was no evidence or insufficient evidence that Littlepage slandered Duncan's title; (3) there was no evidence or insufficient evidence to support the jury's finding of $39,000 damages or, in the alternative, the award constituted a double recovery; and (4) attorney's fees were improperly awarded under the Declaratory Judgments Act or, in the alternative, there was no evidence of necessity or reasonableness of attorney's fees.

On May 2, 1997, the trial court granted Littlepage's motion, vacated the judgment, and entered its modified final judgment declaring:

> there is no evidence of probative force to sustain certain findings of the jury, the contrary to the jury's answer to Question No. 1 is established as a matter of law, that the jury's findings in answer to Questions Nos. 1, 3, 4, and 13 of the verdict should be set aside and a modified judgment should be rendered, as a matter of law, and that Plaintiff Duncan Land & Exploration, Inc., take nothing.

### III. STANDARDS OF REVIEW

Although Littlepage's motion was entitled motion for new trial and alternative motion to modify, correct and reform the judgment, the trial court's judgment was akin to a judgment non obstante veredicto (JNOV). A trial court may render JNOV if a directed verdict would have been proper. *See* TEX.R. CIV. P. 301. A motion for JNOV should be granted when the evidence is conclusive and one party is entitled to judgment as a matter of law. See *Mancorp, Inc. v. Culpepper*, 802 S.W.2d 226, 227–28 (Tex. 1990). A JNOV will be affirmed if there was no evidence to support an issue or, conversely, if the evidence established an issue as a matter of law. See *Exxon Corp. v. Quinn*, 726 S.W.2d 17, 19 (Tex.1987); *Navarette v. Temple Indep. Sch. Dist.*, 706 S.W.2d 308, 309 (Tex.1986). If there is more than a scintilla of competent evidence supporting the jury's finding, it must be upheld and the JNOV will be reversed. See *Mancorp*, 802 S.W.2d at 227–28; *Navarette*, 706 S.W.2d at 309. In making the determination of whether there is more than a scintilla of evidence on which the jury could have made the finding, we must view the evidence in the light most favorable to the finding, considering only the evidence and inferences supporting the finding and rejecting the evidence and inferences contrary to the finding. See *Mancorp*, 802 S.W.2d at 227–28; *Navarette*, 706 S.W.2d at 309.

A trial court cannot disregard a jury's answer (and enter JNOV) because it is against the great weight and preponderance of the evidence. See *Alm v. Aluminum Co. of Am.*, 717 S.W.2d 588, 594 (Tex.1986). When the trial court states no reason why it granted JNOV and the motion presents multiple grounds on which JNOV should be granted, the appellant has the burden of showing that the judgment cannot be sustained on any of the grounds stated in the motion. See *Fort Bend County Drainage Dist. v. Sbrusch*, 818 S.W.2d 392, 394 (Tex. 1991).

In determining a "no-evidence" point, we are to consider only the evidence and inferences that tend to support the finding and disregard all evidence and inferences to the contrary. *See Leitch v. Hornsby*, 935 S.W.2d 114, 118 (Tex.1996). If there is more than a scintilla of such evidence to support the finding, the claim is sufficient as a matter

of law, and any challenges go merely to the weight to be accorded the evidence. *See id.*

■ If an appellant is attacking the legal sufficiency of an adverse answer to a finding on which he had the burden of proof, the Texas Supreme Court has stated that the appellant must, as a matter of law, overcome two hurdles. *See Victoria Bank & Trust Co. v. Brady,* 811 S.W.2d 931, 940 (Tex.1991). First, the record must be examined for evidence that supports the finding, while ignoring all evidence to the contrary. Second, if there is no evidence to support the fact finder's answer, then the entire record must be examined to see if the contrary proposition is established as a matter of law. *See id.; Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 690 (Tex.1989).

■ An assertion that the evidence is "insufficient" to support a fact finding means that the evidence supporting the finding is so weak or the evidence to the contrary is so overwhelming that the answer should be set aside and a new trial ordered. *See Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965). We are required to consider all of the evidence in the case in making this determination. *See Jaffe Aircraft Corp. v. Carr,* 867 S.W.2d 27, 29 (Tex.1993).

■ In reviewing a point asserting that an answer is "against the great weight and preponderance" of the evidence, we must consider and weigh all of the evidence, both the evidence that tends to prove the existence of a vital fact as well as evidence that tends to disprove its existence. *See Ames v. Ames,* 776 S.W.2d 154, 158–59 (Tex.1989), *cert. denied,* 494 U.S. 1080, 110 S.Ct. 1809, 108 L.Ed.2d 939 (1990); *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986). So considering the evidence, if a finding is so contrary to the great weight and preponderance of the evidence as to be manifestly unjust, the point should be sustained, regardless of whether there is some evidence to support it. *See Watson v. Prewitt,* 159 Tex. 305, 320 S.W.2d 815, 816 (1959); *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

## IV. DISCUSSION

Duncan and Littlepage present points and cross-points on a myriad of issues related to three questions answered by the jury in the affirmative: (1) was there production in commercial quantities; (2) did Littlepage slander Duncan's title; and (3) was Duncan entitled to attorney's fees. In doing so, Duncan and Littlepage basically agree the trial court's modified final judgment was probably entered because the court found Duncan's production was in violation of the shut-in order, precluding Duncan from establishing production as a matter of law. However, the parties treat the judgment as one in which no grounds were given for the rulings made. *See Sbrusch,* 818 S.W.2d at 394. Therefore, the parties address all issues raised by Littlepage's motion for new trial and alternative motion to modify, correct, and reform the judgment by way of Duncan's points and Littlepage's reply points. *See id.* Along with the parties, we believe the trial court's modified final judgment was probably entered on the ground that Duncan's production was in violation of the shut-in order ("the contrary to the jurys answer to Question No. 1 is established as a matter of law"), such that the jury's findings as to slander of title and attorney's fee's automatically failed. However, the modified final judgment also states "there is no evidence of probative force to sustain certain findings of the jury," i.e. to establish production. The judgment did not state whether the no evidence finding was based on the public policy theory or a true lack of evidence. Therefore, because the trial court's order was not specific, we must address all issues raised in appellee's motion and appealed by Duncan. *See id.*

### A. PRODUCTION

In its first point, Duncan claims the trial court erred in granting JNOV because there is sufficient evidence to support the jury's answer to Question No. 1 and because the answer is not contrary to the evidence or the law. Specifically, Duncan contends: (1) Littlepage cannot raise illegality on appeal because it was not pleaded or proved at trial;[2] (2) its violation of the Railroad Commission

---

2. Duncan raised this issue for the first time in a supplemental brief.

shut-in order did not affect the lease agreement; and (3) it never ceased to produce in commercial quantities for a period of 90 days. Littlepage argues JNOV was proper as a matter of law because Duncan's illegal production cannot be commercial production. In the alternative, Littlepage argues, by way of its first cross-point, that the jury's answer is against the great weight and preponderance of the evidence.

### 1. Failure to Plead Illegality

Duncan contends Littlepage waived the affirmative defense of illegality by not pleading it at trial. Littlepage argues: (1) Duncan anticipatorily pled the shut-in order in its first petition so that he was not required to plead illegality; (2) to permit Duncan to base a cause of action on its own illegal conduct is contrary to public policy; and (3) illegality was tried by consent.

Texas Rule of Civil Procedure 94 lists illegality as an affirmative defense that must be pled or else it is waived. However, the Texas Supreme Court has fashioned an exception:

[I]f the illegal nature of the *document* to be relied upon or sought to be enforced is apparent from the plaintiff's pleadings, it is not necessary that illegality be specially pleaded by the defendant in order to rely upon it as a defense.

*Lewkowicz v. El Paso Apparel Corp.*, 625 S.W.2d 301, 303 (Tex.1981) (emphasis added); *see also Shoemake v. Fogel, Ltd.*, 826 S.W.2d 933, 937 (Tex.1992); *Phillips v. Phillips*, 820 S.W.2d 785, 789–90 (Tex.1991). In Lewkowicz, the appellant failed to raise illegality in its pleading or in its motion for new trial; yet, the court allowed illegality to be raised for the first time on appeal. *See Lewkowicz*, 625 S.W.2d at 303. The court extended the exception to cover the affirmative defenses of parental immunity and penalty, respectively, reasoning that because it reasoned that "[p]leading an agreement illegal on its face in effect anticipates the defense" and that "courts will not enforce a plainly illegal contract even if the parties do not object." *Shoemake*, 826 S.W.2d at 937; *Phillips*, 820 S.W.2d at 789. However, one court has analyzed the exception and still found waiver

because illegality was not facially indicated on the plaintiff's pleadings. *See City of Terrell v. McFarland*, 766 S.W.2d 809, 811 (Tex. App.–Dallas 1988, no writ), *disapproved on other grounds by, Dallas Mkt. Ctr. Dev. Co. v. Liedeker*, 958 S.W.2d 382, 387 (Tex.1997).

■ A review of the applicable case law and the facts in the case at hand leads to several conclusions: (1) illegality, as an affirmative defense, is normally raised in connection with a contract that is invalid on its face; (2) the Texas Supreme Court fashioned the illegality exception for public policy reasons; and (3) the case at hand does not fit under the framework of the illegality exception. First, this is not a situation where the lease itself is illegal on its face. In fact, Littlepage seeks to enforce the terms of the lease by arguing that Duncan should not be able to gain from his illegal conduct *in satisfying the terms of the lease*. Thus, this is not a normal illegal contract case. However, Littlepage attempts to couch it as such by arguing that Duncan anticipatorily pled the existence of the shut-in order by referring to it in its petition. The petition mentions the shut-in order and outlines a possible force majeure defense, but it does not facially show the contract itself was illegal, much less that Duncan's production was illegal. Thus, we find that the illegality exception does not apply. *See City of Terrell*, 766 S.W.2d at 811.

■ Littlepage also argues that public policy warrants review of this issue and that the issue was tried by consent. In light of the supreme court's willingness to address illegality for the first time on appeal, we stretch the confines of the trial by consent doctrine to find that the parties tried the issue of illegality by consent. An issue is tried by consent when a party introduces evidence to support an issue that is not included in the written pleadings and no objection is made to the lack of pleadings. *See* TEX.R. CIV. P. 67; *Bell v. Meeks*, 725 S.W.2d 179, 179–80 (Tex.1987). Affirmative defenses may be tried by consent even if not properly pleaded. *See Bowles v. Reed*, 913 S.W.2d 652, 659–60 (Tex.App.–Waco 1995, writ denied). "When the defense at issue is not properly pleaded but is brought before the

trial court by the active assistance of both parties, it will be considered to have been properly raised to the trial court." *Id.*

 Here, Brian Duncan took the stand and acknowledged that he produced the well in violation of the Railroad Commission shut-in order. Thereafter, Littlepage and Hulsey contended that the production in violation of the shut-in order could not constitute production in commercial quantities because a reasonably prudent producer would not risk severance of the gas line or losing their license by violating the order. Thus, Duncan's actions were before the court and the jury. Moreover, illegality is a question of law such that a jury instruction was unnecessary. *See, e.g., Graphilter Corp. v. Vinson,* 518 S.W.2d 952, 954 (Tex.Civ.App.–Dallas 1975, writ refd n.r.e.) (upholding JNOV on the ground the contract was illegal as a matter of law); *see also Transit Enter., Inc. v. Addicks Tire & Auto Supply, Inc.,* 725 S.W.2d 459, 462 (Tex.App.–Houston [1st Dist.] 1987, no writ). Although Littlepage failed to plead the affirmative defense of illegality, we find the issue of illegality was tried by consent. Thus, we turn to the merits of Duncan's first point.

### 2. The Illegal Acts Rule and the Effect of the Shut-in Order on the Lease

We must decide whether, as a matter of law, the Railroad Commission's shut-in order precluded Duncan from producing gas in commercial quantities. Duncan contends: (1) the Railroad Commission does not undertake to adjudicate property rights; (2) the Railroad Commission cannot interpose provisions in leases; and (3) illegality does not render the lease agreement void. Littlepage counters that public policy dictates that a party cannot recover where it must prove, as a part of its claim, its own illegal act or transaction.

 We first address the Railroad Commission's ability to affect a lease between two private entities. The Railroad Commission's power is not derived from the Texas Constitution. *See Railroad Commn. of Texas v. City of Austin,* 524 S.W.2d 262, 267 (Tex.1975). It comes from legislative grants of powers and jurisdiction. *See id.*

The Railroad Commission does not have jurisdiction to void contracts. *See id.* Nor does it have power to determine title to land or property rights:

> [The Railroad Commission] is invested with broad powers to determine where, or whether, wells may be drilled, and how much oil or gas may be produced. But it does not have authority to determine the ownership of oil or gas, or how the proceeds from the sale of oil or gas should be apportioned among people who contend that it was, or is, actually being produced from beneath their land.

*Id.* at 267–68; *see, e.g., Jones v. Killingsworth,* 403 S.W.2d 325, 328 (Tex.1966) (holding that "[t]he Railroad Commission has no power to determine property rights"); *Nale v. Carroll,* 155 Tex. 555, 289 S.W.2d 743, 745 (1956) (finding that "[r]ules and regulations of the Railroad Commission cannot effect a change or transfer of property rights"); *Magnolia Petroleum Co. v. Railroad Commn.,* 141 Tex. 96, 170 S.W.2d 189, 190–91 (1943) (stating that the Railroad Commission "does not undertake to adjudicate questions of title or rights of possession"); *see also Gray v. Helmerich & Payne, Inc.,* 834 S.W.2d 579, 582 (Tex.App.–Amarillo 1992, writ denied); *Estate of Grimes v. Dorchester Gas Producing Co.,* 707 S.W.2d 196, 203 (Tex.App.–Amarillo 1986, writ refd n.r.e.). Thus, the existence of the Railroad Commission's shut-in order, by itself, did not affect the lease, or the rights of Duncan and Littlepage under the lease.

 We move to the question of whether public policy should preclude Duncan's recovery. Littlepage argues the applicability of the unlawful acts rule, which states that no action may be predicated upon an admittedly unlawful act of the party asserting it. *See, e.g., Rodriquez v. Love,* 860 S.W.2d 541, 544 (Tex.App.–El Paso 1993, no writ); *Farha v. Elam,* 385 S.W.2d 692, 695 (Tex.Civ.App.–Fort Worth 1964, writ refd n.r.e.). Littlepage also notes that contract rights remain subject to loss by the valid exercise of the Railroad Commission's police powers. *See City of New Braunfels v. Waldschmidt,* 109 Tex. 302, 207 S.W. 303, 305–06 (1918). Dun-

can counters that a contract that a party could have performed in a legal manner is not rendered illegal merely because it was performed in an illegal manner. *See Estate of Grimes,* 707 S.W.2d at 203; *see also Corporate Leasing Intl., Inc. v. Groves,* 925 S.W.2d 734, 738 (Tex.App.–Fort Worth 1996, writ denied). Duncan also asserts that violations of Railroad Commission orders are sanctionable exclusively under the Texas Natural Resources Code.

■ Parties to an oil and gas lease are presumed to have contracted with knowledge of the law and of the Railroad Commission's rules and powers. *See Atkinson Gas Co. v. Albrecht,* 878 S.W.2d 236, 241 (Tex.App.–Corpus Christi 1994, writ denied); *Hydrocarbon Management, Inc. v. Tracker Exploration, Inc.,* 861 S.W.2d 427, 436 (Tex.App.–Amarillo 1993, no writ). The Railroad Commission's powers include authority to set laws, rules, and orders and then punish violators of those laws, rules, or orders. *See* TEX. NAT. RES. CODE ANN. §§ 85.202(b), 86.042, 86.221 (Vernon 1993) (outlining powers of Railroad Commission in area of oil and gas conservation); *Harrington v. Railroad Commn.,* 375 S.W.2d 892, 895 (Tex.1964). Other powers include the right to sever the gas pipeline, seal the well, compel forfeiture, or revoke a producer's license. *See generally id.*

Although we acknowledge the impropriety of Duncan's actions, the authority of the Railroad Commission, and the general applicability of the illegal acts rule, we conclude that the extraordinary circumstances of this case dictate that public policy should not preclude Duncan from recovery as a matter of law. First, the circumstances of this case merit special consideration. Here, a third party notified the Railroad Commission that there was an odor coming from Duncan's well. Before ever setting foot on the property, the Railroad Commission preemptively shut-in the well. Thus, Duncan was, in effect, ordered to shut-in his well before any investigation had been undertaken. Upon testing the well, the Railroad Commission determined the well was not in violation of Rule

36. However, instead of lifting the shut-in order, the Railroad Commission ordered another test, and then another test, after the second test, showed no violation of Rule 36.

In the end after three tests and six months, the record conclusively shows that the well was never actually in violation of Rule 36, which was the only reason for the Railroad Commission's involvement in the first place. Although we acknowledge that the Railroad Commission had the right to investigate the presence of sour gas in the name of public policy (public safety and the preservation and conservation oil and gas resources) and that Duncan had to endure the Railroad Commission's plodding efforts, we believe it would be both ironic and excessive to punish Duncan a second time under the guise of a new and different public policy (the illegal acts rule) when he was mired in a complex Catch–22 situation that was largely out of his control.

■ We do not condone or in any way approve of Duncan's actions. However, we recognize Duncan had two viable options, he could either violate the shut-in order and keep his lease or abide by the order and lose the lease.[3] The dissent cites various administrative remedies Duncan could have used to preserve his lease. While we acknowledge the existence of these remedies, the record shows Duncan did not have the money to buy sweeteners for the well, much less hire an attorney and pursue various administrative remedies when he had no guarantee of success and no apparent need for such action. Hindsight is 20/20 and Duncan could not have expected that it would take three separate tests, over a period of six months to remedy the situation, especially when the well passed each test that was administered.

Second, we do not believe Littlepage should be rewarded for his own questionable actions. Although Duncan brought this suit, his claims are essentially defensive in nature. For all intents and purposes, Duncan was forced to file suit after Littlepage "fired the first shot" by filing his affidavit. In essence, Littlepage seeks to use the Railroad Com-

---

3. Littlepage went to great lengths at trial to show Duncan could have solved its problems with the Railroad Commission much faster if it had spent money to buy sweeteners. However, Brian Duncan testified it was not economically feasible during the shut-in period.

mission order as an offensive tool to wrest and keep the well from Duncan. We do not believe this is the Railroad Commission's designed use, nor do we think equity should reward Littlepage, by penalizing Duncan, when the jury that heard this case to verdict determined Littlepage's actions were malicious. *See, e.g., City of Austin,* 524 S.W.2d at 267–68; *Estate of Grimes,* 707 S.W.2d at 203–04.

Further, Littlepage's malicious acts should prevent him from re-acquiring the lease. The record includes the following evidence that works against him:

– Littlepage knew the well continued to produce because his operations manager, Bedingfield, told him so;

– Bedingfield never told him there was no production for several months, only perhaps minimal production;

– Littlepage received and cashed checks off the production during the time period he now says there was no production;

– Bedingfield told Littlepage about the income he had received;

– Littlepage made no inquiry into Duncan's operating costs before filing the affidavit;

– Littlepage filed his affidavit of non-production in December of 1992 before he received Bedingfield's report on production in March of 1993; and

– Littlepage filed his affidavit after the shut-in order was lifted and after Duncan had installed the two gas sweeteners.

A party should not be allowed to assert rights and privileges inconsistently with his previous positions. *See Wils v. Robinson,* 934 S.W.2d 774, 782–83 (Tex.App.Houston [14th Dist.] 1996, *writ granted w.r.m.,* 938 S.W.2d 717, 717 (Tex.1997)). The theory of quasi-estoppel should apply where it would be unconscionable to allow someone to maintain a position inconsistent to one in which he acquired, or by which he accepted a benefit. *See id.* at 783. "Quasi-estoppel is ... a term

applied to certain legal bars such as ratification, election, acquiescence, or acceptance of benefits." *Id.* We believe quasi-estoppel likewise applies here. Littlepage should not be able to benefit, as he has, by accepting royalty payments, and then waiting until after the shut-in had been released and until after Duncan had installed the sweeteners, to file his non-production affidavit.

Third, we believe this court should tread lightly when reviewing inherently private, contractual matters involving the ownership of "land."[4] While we agree the violation of Rule 36 is an inherently public matter, Duncan's relationship with Littlepage was separate and apart from its relationship with the Railroad Commission. Littlepage should not be able to bootstrap himself onto the Railroad Commission's inherently public powers to take advantage of Duncan in connection with their inherently private lease. *See, e.g., City of Austin,* 524 S.W.2d at 267–68; *Estate of Grimes,* 707 S.W.2d at 203–04. This would amount to a private quasi-condemnation power. By way of example, a lessor who only needs a few week's nonproduction to obtain reversion of a lease could abuse such a power by reporting the lessee to the Railroad Commission, resulting in a preemptive shut-in order that would jeopardize the lessee's ability to retain the lease. While this does not appear to be the case here, the fact remains that Duncan satisfied the terms of the lease as it related to Littlepage and the determination of, and penalization for, any other ancillary matters, including violation of the shut-in order, should be left to the Railroad Commission. *See Estate of Grimes,* 707 S.W.2d at 203–04.

Additionally, if we allow the trial court's JNOV to stand, we are, in essence, re-writing the parties' lease. Littlepage is asking us to read this purely private lease as if it says:

"In the event that any ... tract ... shall fail to produce oil or gas in commercial quantities *or shall produce in violation of*

---

4. We note that illegality and the illegal acts rule have almost exclusively been invoked to prevent a private entity from bringing a claim against the Railroad Commission, not another private entity. *See, e.g., Whittington v. Smith,* 16 F.Supp. 448, 452 (E.D.Tex.1936); *L & G Oil Co. v. Railroad Commm.,* 368 S.W.2d 187, 193 (Tex.1963). In other words, it appears courts in oil and gas cases have only invoked the illegal acts rule against a private entity when doing so favored the Railroad Commission. *See id.*

*any Railroad Commission Shut-in Order ... for a period of 90 days the interest shall terminate.*

This we may not do.

For these reasons, we find public policy and the illegal acts rule do not preclude Duncan from recovering the well.

### 3. Production in Commercial Quantities

In two of his cross-points, Littlepage argues: (1) the jury's finding of production in commercial quantities is against the great weight and preponderance of the evidence; and (2) there is factually insufficient evidence to support the jury's affirmative answer to Jury Question No. 2 concerning whether a reasonably prudent operator would continue to operate the well. Texas courts consistently use a two-prong test to decide whether a well is producing in paying, or commercial, quantities.[5] *See Garcia v. King,* 139 Tex. 578, 164 S.W.2d 509, 511–12 (1942) (finding that the word "produce" is synonymous with the phrase "producing in paying quantities"). First, a court asks whether the production is sufficient to pay the lessee a profit, even a small one, over the operating and marketing expenses, although the cost of drilling the well may never be repaid. See *id.* at 511–12; *Hydrocarbon Management, Inc.,* 861 S.W.2d at 432 n. 4. Second, if the first prong is answered in the affirmative, the court asks whether or not, under all relevant circumstances, a reasonably prudent operator would continue to operate the well in the manner in which it is being operated for the purpose of making a profit and not merely for speculation. *See Clifton v. Koontz,* 160 Tex. 82, 325 S.W.2d 684, 691 (1959); *Hydrocarbon Management, Inc.,* 861 S.W.2d at 432 n. 4. Whether an oil or gas well is producing in paying quantities is ordinarily a question of fact, but where it is shown that a small profit has been realized

from the operation of the well, it may be found as a matter of law that the well is producing in paying quantities. *Hydrocarbon Management, Inc.,* 861 S.W.2d at 432 n. 4; *see also Skelly Oil Co. v. Archer,* 163 Tex. 336, 356 S.W.2d 774, 783 (1962) (op. on rehg). Here, Brian Duncan testified: (1) the well was operated periodically from May to December 1992 with minimal operating expenses due to the nature of the well and Duncan's business; (2) the well produced only enough gas to make a small profit in order to sustain the lease; and (3) he would have still made a profit if he had included various other expenses brought up by Littlepage's expert. In addition, Duncan introduced the original and revised P–1s submitted to the Railroad Commission, which all show that the well never stopped producing for a 90–day period. Littlepage and Bedingfield even acknowledged the P–1s did not show a 90–day period of no production. In fact, Bedingfield acknowledged Littlepage received a royalty check in November 1992 for gas produced during the period in question. We hold the jury's finding is not so contrary to the great weight and preponderance of the evidence as to be manifestly unjust. *See Watson,* 320 S.W.2d at 816; *In re King's Estate,* 244 S.W.2d at 661. We overrule Littlepage's first cross-point.[6]

## B. SLANDER OF TITLE

In its second point, Duncan contends there is factually sufficient evidence to support the jury's answer to Questions No. 3 and 4 regarding slander of title and the award of $39,000 in special damages. In his reply points and his third and fourth cross-points, Littlepage contends: (1) there is no evidence or factually insufficient evidence to support the jury's finding that Littlepage slandered Duncan's title; (2) there is no evidence of

5. Littlepage argues the traditional test is inappropriate as to this lease. Yet, he offers no real substitute. Moreover, Littlepage used this test at trial. Thus, we choose to apply the traditional test to this rather unique lease.

6. Having upheld the jury's finding that production in commercial quantities did not cease, we need not address Littlepage's second cross-point.

*See Hydrocarbon Management, Inc.,* 861 S.W.2d at 432 n. 4. However, we note Duncans testimony that a reasonably prudent operator would have operated the well in order to keep the lease and realize the potential profits upon the drilling of a new well. That Littlepage and his expert opined that a reasonably prudent would not have operated the well does not mean the jurys finding was factually insufficient. *See Garza,* 395 S.W.2d at 823.

special damages; or (3) in the alternative, the award of special damages constitutes an impermissible double recovery.

■ To recover in an action for slander of title, a party must allege and prove: 1) the uttering and publishing of disparaging words; 2) falsity; 3) malice; 4) special damages; 5) possession of an estate or interest in the property disparaged; and 6) the loss of a specific sale. *See Williams v. Jennings,* 755 S.W.2d 874, 879 (Tex.App.–Houston [14th Dist.] 1988, writ denied). Three of these elements are at issue on appeal: malice, special damages, and loss of a specific sale.

### 1. Malice

■ In the context of a slander of title action, the type of malice required is "legal malice", which means "merely that the act must have been deliberate conduct without reasonable cause." *Id.* at 882. However, the charge submitted to the jury, which was not objected to, asked whether Littlepage acted with "reckless disregard." This is a form of "actual malice," which is required for exemplary damages.[7] *See American Natl. Bank & Trust Co. v. First Wisconsin Mortgage Trust,* 577 S.W.2d 312, 317 (Tex.Civ. App.–Beaumont 1979, writ refd n.r.e.), *disapproved on other grounds by, Stewart Title Guar. Co. v. Sterling,* 822 S.W.2d 1, 11 (Tex. 1991).

The parties disagree as to the effect this defective submission has on their respective appellate burdens. In their original briefs, both Duncan and Littlepage argued their respective positions under a legal malice standard, with Littlepage raising the issue of the defective charge and conceding that "legal malice" was deemed found in favor of the original judgment, if there was legally and factually sufficient evidence to support it. *See* TEX.R. CIV. P. 279. Thereafter, in its reply brief, Duncan contended the failure to object to the defective charge meant the case was tried under an actual malice standard and that this standard is controlling on appeal. *See Allen v. American Natl. Ins.,* 380 S.W.2d 604, 609 (Tex.1964). Littlepage then recanted its concession that legal malice was deemed found and argued that Duncan waived its point as to actual malice. Having reviewed the record, we find that the case was submitted on a "reckless disregard" standard, that standard controls on appeal, and Duncan did not waive this issue on appeal. *See id.*

The evidence at trial reveals Littlepage exercised little care in attempting to ascertain the true factual and legal status of the well before filing his affidavit. During the middle of 1994, Littlepage had Ford "keep an eye on the well" and had Bedingfield make a cursory check of the P–1s.[8] Then, months later and *after* the shut-in order was lifted, Littlepage decided to file his affidavit without personally checking whether the well was actually producing gas, without determining Duncan's operating expenses, without rechecking production with Bedingfield or any other employees, and without talking to Brian Duncan himself to find out the true status of the lease. Moreover, Bedingfield admitted that Littlepage received a royalty check for gas produced during the period in question the month *before* he filed his affidavit. Given Littlepage's expertise in the area and the severe repercussions associated with the filing of the affidavit, this is evidence of reckless disregard.

■ Littlepage argues that the fact that he consulted with his attorney negates a finding of malice. *See Humble Oil & Ref. Co. v. Luckel,* 171 S.W.2d 902, 906 (Tex.Civ. App.–Galveston 1943, writ ref'd w.o.m.) (finding no malice where defendant consulted with counsel and acted with bona fide belief that title had been acquired). Duncan contends good faith reliance on counsel is an affirmative defense and that Littlepage failed to plead good faith, so it was waived. *See Murren v. Foster,* 674 S.W.2d 406, 411 (Tex. App.–Amarillo 1984, no writ). Littlepage argues the issue was tried by consent. However, because good faith was a fact issue for the

---

**7.** Before trial, the trial court granted Littlepage partial summary judgment on the issue of exemplary damages.

**8.** This check showed some production, but Littlepage admitted at trial that, at the time of his deposition, he believed that there had been no production.

jury, we find the issue was not tried by consent and was therefore waived. *See id.* In any event, it appears Littlepage's attorney merely filed the affidavit based on Littlepage's recitation of the facts. We have already found Littlepage's lack of effort to uncover those facts is evidence of reckless disregard. Thus, we cannot say that the jury's finding of reckless disregard is legally insufficient or against the great weight of the evidence. Having found the jury's finding of malice was supported by the evidence, we turn to the issues of special damages for loss of a specific sale.

## II. Special Damages and Loss of a Specific Sale

Special damages are those damages that proximately, naturally, and reasonably result from the alleged slander. *See Williams,* 755 S.W.2d at 884. In order to recover special damages, the plaintiff must prove the loss of a specific, pending sale that was defeated by the slander. *See A.H. Belo Corp. v. Sanders,* 632 S.W.2d 145, 146 (Tex. 1982); *Williams,* 755 S.W.2d at 884. A plaintiff may recover the amount he would have realized from the sale less the amount for which he could have sold the lease at the time of the trial with the cloud removed. *See Williams,* 755 S.W.2d at 885; *see also Reaugh v. McCollum Exploration Co.,* 139 Tex. 485, 163 S.W.2d 620, 622 (1942).

Here, Duncan presented evidence that: (1) Brian Duncan had lined up three specific investors who were willing to invest $40,000 up front and finance another $20,000 to acquire 3/8 interest in the lease; (2) the investors pulled out after Littlepage filed his affidavit and Duncan told them of the existence of the legal problems with the lease; and (3) the 3/8 interest had little or no value at the time of trial because the investors were weary of investing in any venture that had legal problems. From this evidence, the jury could reasonably have concluded that the existence of a lost sale (the money from the three investors), the value of the lost sale (approximately $40,000 up front), and the value of the interest at the time of trial with the cloud removed warranted a verdict of $39,000 in special damages. We sustain appellant's second point and overrule Littlepage's third and fourth cross-points.

## IV. ATTORNEY'S FEES

In its third point, Duncan contends attorney's fees were properly awarded because it filed suit for a declaratory judgment and Littlepage's offer to withdraw his affidavit does not extinguish his right to attorney's fees. Littlepage contends attorney's fees were not recoverable because a declaratory judgment was improper under the circumstances and because his offer to withdraw the affidavit rendered the award unnecessary. Also, in his fifth cross-point, Littlepage argues there is factually insufficient evidence of the reasonableness and necessity of the attorney's fees and no evidence of the segregation of the same.

### 1. Propriety of Suit for Declaratory Judgment

In order to be awarded attorney's fees, a party must show the fees were incurred during the prosecution of a suit for a cause of action for which fees are allowed. *See Stewart Title Guar. Co.,* 822 S.W.2d at 10. Attorney's fees are available in suit for a declaratory judgment. See Tex. Civ. Prac. & Rem.Code Ann. § 37.009 (Vernon 1997). Where a party brings several causes of action, some of which entitle it to attorney's fees and some of which do not,· and the causes of action are so intertwined as to be more or less inseparable, the total amount of attorney's fees incurred may be awarded. *See Burditt v. Sisk,* 710 S.W.2d 114, 116 (Tex.App.–Corpus Christi 1986, no writ). A determination of attorney's fees is ordinarily left to the discretion of the trial court. *See Anderson v. McRae,* 495 S.W.2d 351, 356 (Tex.Civ.App.–Texarkana 1973, no writ).

A declaratory judgment is available where a legal right is disputed:

> A person interested under a deed, will, written contract, or other writings constituting a contract or whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract, or franchise may have determined any question of construction or validity arising under the instrument, statute, ordinance,

contract, or franchise and obtain a declaration of rights, status, or other legal relations thereunder.

See TEX. CIV. PRAC. & REM.CODE ANN. § 37.004.

■ Suits for declaratory judgments are available on a wide variety of substantive issues and are to be liberally construed:

The Declaratory Judgments Act is therefore not limited in its application to strict actions to declare rights under written instruments and statutes. It is applicable whenever there is a justiciable controversy involving uncertainty or insecurity as to the rights, legal relations or status of parties and when declaratory relief will settle the dispute and put an end to the controversy. A wide variety of factual situations has been recognized as entitling one or both sides of a controversy to declaratory relief.

McRae, 495 S.W.2d at 356 (discussing application of Declaratory Judgment Act in connection with suits to enforce and/or clarify rights to real property); see also TEX. CIV. PRAC. & REM.CODE ANN. § 37.002.

■ Here, Littlepage argues Duncan: (1) sought declaratory relief solely to obtain attorney's fees; and (2) raised no legal issue pertaining to the construction or validity of the lease. However, Duncan's actions for removal of a cloud on title and slander of title did not preclude him from bringing an action for declaratory judgment where the circumstances of the case made it ripe for declaratory relief. See McRae, 495 S.W.2d at 356 (stating that "the existence of another adequate remedy does not bar the maintenance of an action for declaratory relief"). Also, Littlepage's argument that no legal issues were raised in this suit is not overly compelling given the fact that the bulk of his appeal centers around his claim that Duncan's illegal acts precluded him from recovering as a matter of law.

### 2. Offer to Withdraw the Affidavit

■ Littlepage also argues his offer to withdraw his affidavit, made soon after the suit was filed, precludes the award of attorney's fees. In support of his position, Littlepage cites a line of cases involving suits on notes where the defendant tendered payment on the note *before* suit was filed, the tender was rejected, attorney's fees were sought at trial, and the appellate court held the offer to pay the amount due on the note rendered attorney's fees unnecessary. See, e.g., Guaranty Bank v. Thompson, 632 S.W.2d 338, 340 (Tex.1982); Lawrence v. Boles, 631 S.W.2d 764, 767 (Tex.App.–Tyler, 1981, no writ); Dawson v. Falfurrias State Bank, 181 S.W. 553, 554 (Tex.Civ.App.–San Antonio 1916, writ refd). Although we acknowledge the premise behind these cases, we find they have no application to the case at hand. Not only is a suit on a note inherently different from a suit involving rights to real property, Duncan would have not been made whole by accepting the offer.

First, Littlepage's offer was made *after* suit was filed. Second, if Duncan had accepted Littlepage's offer, he would have been unable to recoup his already accrued attorney's fees. Third, and most importantly, Duncan would have had to forfeit his cause of action for slander of title damages with no guarantee of being made whole by the investors who had already pulled out of the deal.

### 3. Reasonableness and Necessity

In his fifth cross-point, Littlepage argues there is no evidence or factually insufficient evidence of the necessity or reasonableness of Duncan's attorney's fees. He also argues Duncan is not entitled to prejudgment interest. We disagree with both contentions.

■ At trial, Duncan's attorney, Pat Long, outlined the work he had done on the case, his fee ($250 an hour), and the necessity and reasonableness of the attorney's fee Duncan was seeking. This is some evidence of reasonableness and necessity of attorney's fees. See Leitch, 935 S.W.2d at 118. Littlepages attorney, Donald L. Sweatt, testified that Long's hourly fee was not reasonable. Although this is some evidence of unreasonableness, we do not believe "the evidence supporting the finding is so weak or the evidence to the contrary is so overwhelming that the answer should be set aside and a new trial ordered." Garza, 395 S.W.2d at 823. We also find that the award of prejudgment interest was not an abuse of discretion

in light of the reckless disregard with which Littlepage acted in filing the affidavit. *See Hext v. Price*, 847 S.W.2d 408, 416 (Tex. App.–Amarillo 1993, no writ); *McRae*, 495 S.W.2d at 356. We overrule Littlepage's fifth cross-point.

## VI. Conclusion

Having sustained Duncan's points and overruled Littlepage's cross-points, we reverse the trial court's entry of its final modified judgment, reinstate the jury's findings, and enter judgment in favor of Duncan on those findings in accordance with the trial court's January 22, 1997 judgment.

CAYCE, C.J. filed a dissenting opinion.

CAYCE, Chief Justice, dissenting.

I dissent. The majority's holding that a lessee may continue to operate an oil and gas well in violation of a Railroad Commission shut-in order to avoid reversion of the lease and then obtain recovery against the lessor on a cause of action predicated on the illegal production is contrary to settled Texas law and sound public policy.

The Railroad Commission ordered the McCluskey No. 1 well shut-in for alleged violations of Statewide Rule 36 pursuant to the authority granted to it under sections 86.042 and 85.202(b) of the Natural Resources Code.[9] Duncan admits operating the well in violation of the shut-in order, and it is undisputed that Duncan must rely on evidence that it produced gas in violation of the shut-in order to prevail on its causes of action against Littlepage. Therefore, Duncan is barred from recovering against Littlepage, as a matter of law, because its causes of action are predicated on Duncan's illegal operation of the well in violation of the shut-in order.

The Supreme Court of Texas has long held that Railroad Commission orders have the same force and effect of law and that the violation of such rules and orders is illegal.[10] Another well-established rule enunciated by the supreme court over a century ago is that *"no action will lie to recover a claim for damages, if to establish it the plaintiff requires aid from an illegal transaction, or is under the necessity of showing or in any manner depending upon an illegal act to which he is a party."*[11] Applying these settled rules of law, the trial court was constrained to find that, notwithstanding the jury's verdict, Duncan is barred from recovery because its causes of action against Littlepage were established by evidence that Duncan illegally produced gas in violation of a Railroad Commission shut-in order.

Although the majority acknowledges the continued validity of the rule of law derived from long-standing supreme court decisions prohibiting recovery for causes of action based on illegal acts, they wholly abandon the precedent of those decisions. As an inferior court, we are absolutely bound to follow

**9.** *See* 16 Tex. Admin. Code § 3.36 (effective Apr. 7, 1995), <http://www.sos.state.tx.us/tac/16/1/3/3.36.html>. Section 86.042 provides:
The commission shall adopt and enforce rules and orders to:
(1) conserve and prevent the waste of gas;
(2) prevent the waste of gas in drilling and producing operations and in the piping and distribution of gas;
. . . .
(9) otherwise accomplish the purposes of this chapter.
Tex. Nat. Res.Code Ann. § 86.042 (Vernon 1993). Section 85.202(b) states:
(b) The commission shall do all things necessary for the conservation of oil and gas and prevention of waste of oil and gas and may adopt other rules and orders as may be necessary for those purposes.
*Id.* § 85.202(b). Section 86.221 states: *"No person may produce gas from a gas well in viola-*

*tion of the valid orders of the commission." Id.* § 86.221 (emphasis supplied).

**10.** *Harrington v. Railroad Comm'n.*, 375 S.W.2d 892, 898 (Tex.1964); *see L & G Oil Co. v. Railroad Comm'n.*, 368 S.W.2d 187, 193 (Tex.1963) ("Rules and orders of the Railroad Commission made under authority of a statute are considered under the same principles as if they were the acts of the Legislature...."); *Automatic Gas Co. v. Dudding*, 189 S.W.2d 780, 782 (Tex.Civ.App.–Texarkana 1945) ("The rules and orders of the Railroad Commission ... are legal and have the force of law ...."), *aff'd*, 145 Tex. 1, 193 S.W.2d 517 (1946).

**11.** *Gulf, C. & S.F. Ry. Co. v. Johnson*, 71 Tex. 619, 9 S.W. 602, 603 (1888) (emphasis supplied); *see Kokernot v. Gilstrap*, 143 Tex. 595, 187 S.W.2d 368, 370 (1945); *Beer v. Landman*, 88 Tex. 450, 31 S.W. 805, 806 (1895).

and apply the rules of law established by higher courts.[12] We have no discretion to do otherwise, even though we may abhor the result in a case.[13]

Moreover, the weight of intermediate appellate court authority in this state is uniformly contrary to the majority's holding.[14] While we are not bound by the decisions of our sister courts, they "should be accorded such a measure of weight and influence as they may be intrinsically entitled to receive, the duty of the court being to conform its decision to what is called the 'general current of authority' or the 'preponderance of authority.' "[15] However, there is no indication in the majority opinion that the decisions of our sister courts were consulted, or accorded any weight whatsoever.

Yet, the most egregious aspect of the. majority's opinion is its holding that an illegal act may be excused when it is committed for the purpose of protecting private contract or property interests. Notwithstanding the fact that this rationale has been squarely rejected by the courts of this state in analogous cases,[16] the majority concludes that when faced with the "complex Catch 22 situation"

of obeying the law and losing the lease, or violating the law and keeping the lease, Duncan was justified in violating the law to keep from losing the lease. This result diminishes the rule of law and will engender disrespect for state agencies entrusted with the responsibility of enforcing the law.

It is our constitutional duty to encourage observance of the law and respect for those who uphold and enforce it,[17] not find excuses for those who deliberately choose to transgress the law. The Railroad Commission shut-in order had the force and effect of law; thus, Duncan's intentional production of gas in violation of this order was illegal. Texas law does not condone this illegal act because it was committed to protect a property or contractual right.[18] Nor is it a defense that the shut-in order was issued on the basis of information that was false or incorrect.[19] By excusing Duncan's violation of the shut-in order for such reasons, and then rewarding Duncan for illegally flaunting the order by allowing Duncan to recover money damages for claims based on its illegal conduct, the majority encourages others to treat the orders of state regulatory agencies with the same contempt as Duncan.[20]

12. *See* Henry Campbell Black, *The Law of Judicial Precedents* 10–11 (1912), *reprinted in* Ruggero J. Aldisert, The Judicial Process 778 (1976).

13. *See id.*

14. *See Johnson v. Odom,* 949 S.W.2d 392, 394 (Tex.App.–Houston [14th Dist.] 1997, pet. denied) (public policy barred plaintiff's malpractice claims against his criminal defense lawyer because the proximate cause of plaintiff's conviction was his unlawful conduct, not his lawyer's alleged negligence); *Saks v. Sawtelle, Goode, Davidson & Troilo,* 880 S.W.2d 466, 469–70 (Tex.App.–San Antonio 1994, writ denied) (recovery based on plaintiff's knowing and willful illegal acts precluded by public policy); *Rodriquez v. Love,* 860 S.W.2d 541, 544 (Tex.App.–El Paso 1993, no writ); *Dover v. Baker, Brown, Sharman & Parker,* 859 S.W.2d 441, 450–51 (Tex.App.–Houston [1st Dist.] 1993, no writ) (public policy barred claims which were "inextricably intertwined" with illegal acts); *Plumlee v. Paddock,* 832 S.W.2d 757, 759 (Tex.App.–Fort Worth 1992, writ denied); *Stevens v. Hallmark,* 109 S.W.2d 1106, 1106 (Tex.Civ.App.–Austin 1937, no writ) ("no legal right, which will form the basis of a cause of action … can be asserted in the courts, the foundation of which must be predicated upon the admittedly unlawful act of the party asserting it").

15. Black, *supra* note 12, at 779.

16. *See, e.g., Kokernot,* 187 S.W.2d at 370 (court held plaintiff barred from recovery on cause of action to enforce a lien on property due to false loan application, even though illegal application was necessary to avoid losing the lien); *Rodriquez,* 860 S.W.2d at 544 (court held plaintiff's unlawful act of driving with a suspended license barred recovery against insurer, even though insurer wrongfully caused license suspension).

17. *See Ex parte Hughes,* 133 Tex. 505, 129 S.W.2d 270, 279 (1939); *State v. Ferguson,* 133 Tex. 60, 125 S.W.2d 272, 279 (1939); *Argonaut Southwest Ins. Co., v. Morris,* 420 S.W.2d 760, 774 (Tex.Civ.App.–Austin 1967, writ ref'd n.r.e.); *see also Vargas v. State,* 838 S.W.2d 552, 557–58 (Tex.Crim.App.1992) (Benavides, J., concurring).

18. *See Kokernot,* 187 S.W.2d at 370.

19. *See Rodriquez,* 860 S.W.2d at 544.

20. The holding of this case, of course, is not limited to cases involving violations of orders issued by state agencies. Logically extended, the majority's rationale would permit a party who commits any type of illegal act to recover against another party on a cause of action based on the illegality, if the complaining party can show that the illegal activity was necessary to avoid economic loss.

Contrary to the majority's characterization of the record, Duncan was not faced with a "Catch 22 situation." Duncan's predicament was largely self-made; the consequence of its own failure to seek available legal remedies to challenge the shut-in order. For instance, Duncan could have sought to have the shut-in order enjoined.[21] Duncan could have also obtained expedited judicial review of the shut-in order.[22] Under section 85.242, had Duncan sought judicial review, a decision of the court would have been rendered "as expeditiously as possible."[23] Duncan, however, took no action other than to continue operating the well in violation of the shut-in order.[24]

The majority argues that "equity" should allow Duncan to recover against Littlepage, notwithstanding Duncan's illegal actions, because Littlepage's actions were found by the jury to be malicious.[25] This assertion stands a well-known principle of equity on its head, and reveals the confusion that lies behind the majority's rationale. In *Whittington v. Smith*,[26] which applied Texas law, the federal district court held that production in violation of the rules of the commission was illegal because the mineral lease owner drilled a well without first obtaining a drilling permit,

as required under Statewide Rule 37.[27] Refusing plaintiff's request to enjoin the Railroad Commission from enforcing whatever penalty warranted under the law, the court stated:

> Plaintiff is . . . asking that the hand of the commission, officers of the state, enforcing the state's conservation laws and its lawful orders thereunder against his unlawfully drilled well, be stayed. This, a court of equity will not do. This is but stating a well-known principle of equity; i.e., *that equity will not aid one who comes as a law violator.*[28]

As a law violator, Duncan is not entitled to equity. More importantly, however, Duncan has not come to court seeking equity; its causes of action seek legal, not equitable, remedies. Consequently, Littlepage's actions are irrelevant to our determination of whether Duncan is precluded from recovering on causes of action based on the illegal production of gas.

Finally, the majority's reliance on *Estate of Grimes v. Dorchester Gas Producing Co.*[29] is misplaced. In Grimes, there was no shut-in order prohibiting production, and, unlike the lessor in Grimes, Littlepage is not seeking to

---

**21.** *See* TEX. NAT. RES. CODE ANN. § 86.224 (Vernon 1993).

> A violation or threatened violation of this chapter may be enjoined by any court of competent jurisdiction in which the suit for penalty may be brought. The court may issue mandatory or prohibitory writs of injunction that the facts justify.
> *Id.*

**22.** *See id.* § 85.241.

> Any interested person who is affected by the conservation laws of this state or orders of the commission relating to oil or gas and the waste of oil or gas, and who is dissatisfied with any of these laws or orders, may file suit against the commission or its members in a court of competent jurisdiction in Travis County to test the validity of the law or order.
> *Id.*

**23.** *Id.* § 85.242.

> A suit brought under Section 85.241 of this code shall be advanced for trial and shall be determined as expeditiously as possible. No postponement or continuance shall be granted except for reasons considered imperative by the court.
> *Id.*

**24.** The majority asserts that Duncan could not afford the legal expenses necessary to challenge the order. However, there is no support in the record for this assertion. The record actually shows that Duncan did have the means to take action, but that it only did so by filing suit against Littlepage after the shut-in order was no longer in effect.

**25.** *See* majority op. at 330. The rationale upon which the majority relies is similar to economic duress. *See Brown v. Cain Chem. Inc.*, 837 S.W.2d 239, 244 (Tex.App.–Houston [1st Dist.] 1992, writ denied); *State Nat'l. Bank v. Farah Mfg. Co.*, 678 S.W.2d 661, 686 (Tex.App.–El Paso 1984, writ dism'd by agr.). However, Duncan neither pleaded nor proved that it was acting under duress when it produced gas in violation of the shut-in order.

**26.** 16 F.Supp. 448 (E.D.Tex.1936).

**27.** *See id.* at 451–52.

**28.** *Id.* at 452 (emphasis supplied).

**29.** 707 S.W.2d 196 (Tex.App.–Amarillo 1986, writ ref'd n.r.e.).

338

have his agreement with Duncan declared void on the basis of illegality.

Furthermore, *Grimes* simply does not stand for the proposition for which it is cited in the majority opinion. Relying on *Grimes as direct* authority, the majority states that "public policy and the illegal acts rule" do not preclude Duncan from recovering against Littlepage because "the determination of, and penalization for" the violation of a shut-in order is the exclusive province of the Railroad Commission.[30] The court in *Grimes*, however, did not address the question of whether public policy should prevent a law violator from recovering money damages on a cause of action based on the violation of a Railroad Commission order. Nor does *Grimes* support the majority's proposition that the existence of statutory penalties for violating Railroad Commission orders precludes the courts of this state from denying recovery to a law violator for the alleged breach of an oil and gas contract on the basis of common law. Rather, the *Grimes* court merely reiterated the well-recognized rule that the actions of the Railroad Commission "are not, of themselves, determinative of contractual questions," and held that a pooling agreement was not rendered illegal simply because it may have been performed in an illegal manner.[31] Littlepage has *not* contended that the farmout agreement with Duncan was rendered illegal because Duncan performed the agreement in an illegal manner; Littlepage only contends that Duncan's production of gas in violation of the shut-in order was illegal and, therefore, should not serve as the basis for the recovery of damages against Littlepage. The *Grimes* opinion does not address this issue.

The trial court was right to set aside the verdict in favor of Duncan because it was based on its admittedly illegal conduct in knowingly and willfully operating a well in violation of a Railroad Commission shut-in order. The majority opinion reversing this ruling is potently wrong; it disserves public policy and undermines the authority of the state agency responsible for regulating the oil and gas industry and protecting the public

from potentially hazardous, unsafe practices in the industry. I would hold that Duncan is barred from recovering against Littlepage on those causes of action predicated upon Duncan's admittedly illegal conduct; that the generally accepted definition of production in "paying" or "commercial" quantities does not include "illegal" production; and, therefore, that the evidence of illegal production did not support a finding of production in commercial quantities in this case, as a matter of law. For these reasons, I would affirm the trial court's judgment.